328 A.2d 731.

ISRAEL BARENBAUM *vs.* HALLAM RICHARDSON *et ux.*

DECEMBER 6, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. In this negligence action a tenant seeks damages from his landlords for injuries he sustained in a fall as he made his way down a front-door stairway to the public sidewalk. A Superior Court jury returned a verdict for the landlords. In his appeal the tenant questions the trial justice's actions relating to an evidentiary ruling, the charge to the jury, and his denial of the tenant's motion for a new trial.

The landlords are husband and wife. They own a four-unit, two-story apartment house which is located at 132 Pitman Street, Providence. The husband owns and operates a company that specializes in the sale and servicing of refrigeration equipment. Two of his employees have a dual responsibility: when not working on refrigerators, they perform a variety of janitorial and maintenance chores at the apartment house. In late September 1967, the duo replaced the front-porch floor and the wooden steps of the Pitman Street property.

One approaching the front door from the sidewalk first steps up onto a cement step. He then ascends four wooden steps, crosses the porch, and enters into the apartment house. The wooden staircase had been built and assembled at a carpentry shop. The steps comprised four treads and five risers. The staircase was transported to defendants' premises. There, the maintenance men gave it a primer coat of paint and then fastened the new addition to the house and to the bottom cement step. The maintenance crew returned to the apartment house on Saturday, November 11, 1967, and applied a deck and porch enamel to the porch and staircase.

In the Fall of 1967 plaintiff was a 70-year-old retiree who worked part time as a clerical and bookkeeping jack-of-all-trades for a shoe sales company whose offices were located in the Olneyville section of Providence. He was a first-floor tenant and had lived at the Pitman Street address for 19 years. The first snowfall of the season occurred during the very early morning hours of November 15, 1967. When plaintiff prepared to leave for work at approximately 7:30 a.m., the snowfall had ceased. He described the morning's accumulation as "light." A member of the maintenance force whose task included the removal of snow from the entranceway and sidewalk called the fall a "slight dusting" which melted rapidly as the sun made its daily westward trek. The tenant parked his car in a driveway that ran alongside the house. The car was located in an area that was equal in distance from the front and rear doorways. The tenant chose to exit by the front door.

He told the court and jury that as he came to the stairs, he switched his lunch bag from his right to his left hand, reached for the bannister, and "as soon as I made the first step I woke up on the sidewalk." The plaintiff returned to his apartment and remained at home for the day. The next morning he went to the emergency room of the Miriam Hospital where he eventually came under the care of an orthopedic specialist. This physician testified that the fall had fractured four of the lumbar vertebrae. In his complaint, plaintiff attributed his fall to the maintenance men's use of an "improper paint" which caused the porch and steps to become "slippery and dangerous when wet."

At the trial, the tenant presented an architect who had inspected the front porch and staircase. He said that the top stair tread was about one inch shorter than the other three treads. Each of the lower treads measured 11¼

inches in width. This witness also reported that the porch extended one inch beyond the top rise and thereby further reduced the actual usable width of the top riser. The expert also notified the jury that his inspection indicated that the staircase had a pitch of about 45 degrees. The trial justice permitted the architect to give an affirmative reply when asked if he had an opinion as to whether the stairway had been improperly designed and a hazard to those who used it. However, the trial justice would not allow the architect to state that opinion. This refusal is the basis of plaintiff's first objection.

The plaintiff in asserting error reminds us that his architect was the same architect who was permitted to render an opinion as to the imporper design and construction of the front entranceway in *Morgan* v. *Washington Trust Co.,* 105 R. I. 13, 249 A.2d 48 (1969). We can only say that there is a difference between the Pitman Street staircase and the double-door vestibule found at the entrance of the Hope Valley Branch of the Washington Trust Company.

We have in the past recognized that an expert's opinion on the ultimate issue to be determined by the jury can be received if the trial justice believes that the receipt of such information will help the jury in its quest for the truth. *Morgan* v. *Washington Trust Co., supra; State* v. *Kozukonis,* 100 R. I. 298, 214 A.2d 893 (1965). This, we noted in *Kozukonis,* is the view espoused by Wigmore. 7 Wigmore, *Evidence* §1921 at 18 (3d ed. 1940). However, we have on numerous occasions delineated the guide to be used in recognizing situations when the jury is in need of expert assistance. The use of expert testimony arises from a need which comes in turn from the fact that the subject matter of the inquiry is one involving special skills and training beyond the ken of the average layman. If all the facts and circumstances can be accurately de-

scribed to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as is the expert, there is no necessity for the expert testimony. The jury in such instances can determine the question just as well as the expert. *See Corning Glass Works* v. *Seaboard Sur. Co.*, 112 R. I. 241, 308 A.2d 813 (1973); *Enos* v. *W. T. Grant Co.*, 110 R. I. 523, 294 A.2d 201 (1972); *Palumbo* v. *Garott*, 95 R. I. 496, 188 A.2d 371 (1963); *Glennon* v. *Great Atl. & Pac. Tea Co.*, 87 R. I. 454, 143 A.2d 282 (1958); *Fontaine* v. *Follett*, 51 R. I. 413, 155 A. 363 (1931). The necessity for the use of expert testimony is a matter which to a considerable extent lies within the sound discretion of the trial court.

In *Morgan* we stressed that the bank's entranceway looked to the untrained eye like so many other doorways. It was only after the architect first described the vacuum that was created within the vestibule when the inner set of doors leading into the main portion of the bank was closed, and then spoke of such things as the narrow landing at the top of the stairs and the improper positioning of the door handles, that the jury could begin to comprehend what had happened to Mrs. Morgan. She had no idea as to what caused her to do a backflip as she went rather unceremoniously and rapidly from the bank's doorway to the street below. Here, the entire thrust of the tenant's claim, at least up until the time of the architect's appearance, was the landlords' use of a "glossy paint," that caused the wet stairs to become "extremely slippery." At no time in his testimony did plaintiff ever attribute his mishap to the design of the stairway. The trial justice allowed the architect to testify as to the staircase's pitch, the overhang of the porch, and the narrowness of the top tread. In his charge, he gave the jury three different ways it might find for the tenant: (1) the use of an improper type of paint; (2) the improper construc-

tion of the stairway; and (3) the maintenance crew's failure to remove the snow from the stairs.

The jury might have found that the stairway with its pitch and narrow top tread was indeed a hazard to those who used it. Nevertheless, to succeed on this theory the tenant was bound to prove that the faulty design caused his fall, and at this point he encountered some difficulty. When one looks at the record as it relates to the actual fall, he finds that the tenant gave three different versions of what happened after he left the front door to go to his car. As noted earlier on direct examination, he said that after he made it to the railing, he "woke up" on the sidewalk. At one point during cross-examination, he stated that he "fell on the sidewalk." The hospital records indicate that when he first went for treatment he told a secretary that he fell because he "missed the last step." Later, he told the surgeon that his fall was caused by the paint.

We see no error in the trial justice's refusal to let the jury hear the architect's opinion because it called for a conclusion of fact that was well within the jury's ability to make. The jury needed no help from the architect. It might well be that plaintiff could have prevailed with his improper design theory had it not been for his inconsistency in describing the actual location of his fall.

In discussing the contributory negligence phase of the litigation, the trial justice told the jury that it was to consider whether, assuming that it found the stairs to be slippery and as perilous as the tenant contended, he acted reasonably in making an exit out the front door when he could have gone to the rear door, taken one step down onto a cement pad, turned left, and been at his car just as if he had successfully completed his allegedly hazardous descent from the front porch to the sidewalk.

This portion of the charge is the result of our recent holding that a landlord does owe a duty to his tenant to keep the common ways reasonably safe from the dangers arising from the natural accumulation of snow and ice. *Fuller* v. *Housing Authority*, 108 R. I. 770, 279 A.2d 438 (1971). In stressing that the landlord has a reasonable time after the cessation of the storm to remove the accumulation, we also pointed out that a tenant who has available alternate routes of ingress and egress cannot expect to recover if he plunges headlong out into the unshoveled or untreated path and ignores another available, safe, exit.

Here, the trial justice, in giving plaintiff the benefit of the *Fuller* rule, also informed the jury that if it was satisfied that things at first were as bad as plaintiff wished it to believe, the jury could properly find that the tenant should have headed for the rear door rather than the front door. The trial justice was correct in charging the jury as he did.

The denial of the new trial motion needs little discussion. There was no blizzard in mid-November 1967. The plaintiff called it light snow. The maintenance men described the fall as a slight dusting of snow. The tenant told the trial justice that as he was leaving for work, there was a "little bit" of snow in the air. A landlord is not required to be at his property, shovel in hand, catching the flakes before they hit the ground. He has reasonable time after the storm has ended to commence his removal effort. There was no evidence of the existence and availability of a nonskid paint that would afford greater friction to the storm-spattered pedestrian than would the paint used by the maintenance crew. Whether the carpenter built a defectively designed staircase and whether it caused the tenant's tumble were, as we have previously noted, questions for the jury. Apart from the question of

the landlords' liability, the trial justice observed that the jury could be well justified in finding that the tenant's exit by the front door on the snowy morning of November 15, 1967 was negligent conduct that would bar the tenant's recovery in any case. We see no reason for faulting the denial of the new trial motion.

The tenant's appeal is denied and dismissed.

*Gunning, LaFazia, Gnys & Selya, Inc., Raymond A. LaFazia, Delphis R. Jones,* for appellant.

*Higgins & Slattery, John A. Baglini,* for appellees.