STATE

v.

Jeffrey **WASHINGTON.**

No. 89–461–C.A.

Supreme Court of Rhode Island.

Nov. 2, 1990.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

MURRAY, Justice.

This case comes before us on appeal by the defendant, Jeffrey Washington (Washington), from his conviction of first-degree murder, for which he was sentenced to life imprisonment without parole. In his appeal, the defendant seeks the following: that he be awarded a new trial on the grounds that certain evidence was improperly admitted; that his conviction be reduced to one of second-degree murder and the matter be remanded for resentencing; and, in the alternative, that his sentence be vacated and a sentence of life imprisonment with possibility of parole be imposed. We reject the defendant's arguments and affirm.

The record discloses the following material facts. On Christmas Day 1987, seventy-three-year-old Alice Carcieri, a double amputee, entertained friends and family members until late in the evening. The defendant, who was employed by Carcieri's brother-in-law and occasionally cleaned house for Carcieri, entered the house through the back door while her guests were present and hid in the cellar, where he slept, ate, and smoked some crack. Sometime around midnight, after the last visitors had gone, defendant went upstairs to Carcieri's bedroom, where she lay asleep. The defendant covered her head with the bedclothes and proceeded to tie her hands to the bedposts with some rope taken from the cellar. By this time Carcieri awoke and yelled once. The defendant then removed her panties and raped her. Carcieri struggled a little, then went limp.

To create the appearance of a burglary, defendant pulled out some drawers and took an envelope from the table before departing. At some point during or shortly after the assault, Carcieri suffered a heart attack and died, still tied to the bedposts. She was found in that position when the police were called the following morning.

After learning of Carcieri's death, defendant changed clothes and discarded what he had been wearing. He stayed high on drugs until Monday, when he realized what he had done. He then stole a car and drove to New York, where he was ultimately apprehended by police in Riverhead, Long Island, for attempted theft of a wallet. While in custody in Riverhead, defendant informed the police of his involvement in the death of Carcieri. The Providence police were contacted, and defendant ultimately confessed and was brought to trial for the sole purpose of sentencing.

Following the presentation of the state's evidence, the defense moved for a judgment of acquittal based on a novel construction of G.L.1956 (1981 Reenactment) § 11-23-1, which defines first-degree felony murder. The trial justice rejected the argument and denied the motion. The defense presented no evidence on its behalf. The jury found defendant guilty of first-degree murder and, after receiving instructions on the aggravating circumstances of aggravated battery and torture, concluded that the murder involved aggravated battery. The trial justice denied defendant's motion for new trial and, finding both aggravated battery and torture as well as a lack of any mitigating circumstances, sentenced defendant to life imprisonment without parole.

With this factual and procedural background in mind, we shall examine the various issues raised by defendant in his appeal.

## I

### ADMISSIBILITY OF DR. SWEENEY'S TESTIMONY

The defendant raises two issues pertaining to testimony by Dr. Kristin Sweeney, the medical examiner. First, defendant argues that the trial court abused its discretion in permitting Dr. Sweeney to render an opinion on the manner of death. Second, he argues that the trial court abused

its discretion by allowing Dr. Sweeney to testify to the extent of pain Alice Carcieri experienced.

The defendant contends that Dr. Sweeney's classification of the manner of death as homicide was an improper application of legal principles. As a medical examiner, Dr. Sweeney is charged by law with investigating those deaths that fall within the category of homicide. General Laws 1956 (1989 Reenactment) § 23–4–3 and § 23–4–4. Black's Law Dictionary defines "homicide" as "[t]he killing of one human being by the act, procurement, or omission of another." Black's Law Dictionary 661 (rev. 5th ed. 1979). An autopsy conclusion of homicide therefore signifies that some human action caused injury to the victim and the victim died as a result. *Manocchio v. Moran*, No. 89–1310, slip op. at 35 (1st Cir., filed Sept. 24, 1990) (reversing the decision of the District Court of Rhode Island and upholding the manslaughter conviction in *State v. Manocchio*, 497 A.2d 1 (R.I.1985)). In *Manocchio v. Moran* the First Circuit analyzed the admissibility of an autopsy report containing a conclusion of homicide, where the victim had died as a result of an undisputed beating. While finding the autopsy report's conclusion arguably admissible, the court determined that any error caused by its admission was harmless beyond a reasonable doubt. *Id.* at 38. The court distinguished those cases in which the same admission could amount to constitutional error:

> "If, for example, decedent had fallen from a window, and the question was whether he was pushed out or had fallen accidentally, a medical examiner's finding of 'homicide' would likely be inadmissible. Such a finding could be highly prejudicial, since it would contradict defendant's claim of accident, and would almost certainly have to be based on a police report or similar extrinsic evidence." *Id.* at 35.

In our present case Dr. Sweeney's conclusion of homicide was based on her objective findings from the autopsy and the undisputed circumstances of the assault. Therefore, we find that her testimony was not an improper application of legal principles but a proper medical conclusion.

Although it is true that causation may have been an ultimate issue of fact for the jury to determine, we do not believe that Dr. Sweeney's testimony was an impermissible invasion of the jury's province. An expert witness's opinion on an ultimate issue of fact may be admitted if the trial justice believes it will help the jurors to clarify an area of inquiry beyond their knowledge. *Barenbaum v. Richardson*, 114 R.I. 87, 90–91, 328 A.2d 731, 733 (1974). If, however, the jury readily understands the facts as they are presented, and comes to the appropriate conclusions, then such expert testimony is unnecessary. *Id.* In this case we believe that the trial justice did not err in finding Dr. Sweeney helpful to the jurors in their assessment of the evidence. As we have previously stated, the admissibility of testimony by an expert witness is a determination well within the discretion of the trial justice. *State v. Castore*, 435 A.2d 321, 325 (R.I.1981); *State v. Gibbons*, 418 A.2d 830, 837 (R.I.1980); *Morgan v. Washington Trust Co.*, 105 R.I. 13, 18, 249 A.2d 48, 51 (1969).

The defendant further contends that Dr. Sweeney's testimony on the manner of death was improper as sheer speculation. We reject this classification because it is evident from the record that Dr. Sweeney was a qualified expert, had conducted a thorough post-mortem examination, and was stating her opinion with the requisite "reasonable degree of medical certainty." As we stated above, Dr. Sweeney's conclusion did not impermissibly invade the jury's province.

The defendant's second argument challenges Dr. Sweeney's testimony that the lacerations to Carcieri's vagina were comparable to those that might occur during childbirth. The defendant challenges the admissibility of this testimony as sheer speculation on the extent of pain suffered by Carcieri. He fails to take note, however, of the true reason the information was elicited. It was not elicited to establish how painful Carcieri's final moments of consciousness were; in fact, the trial jus-

tice had made it clear that any opinion on the *amount* of pain experienced by Carcieri would be inadmissible. Rather, the state was asking Dr. Sweeney to aid the jury in comprehending the *type* of lacerations inflicted. Doctor Sweeney complied by stating that they would have been painful and that they might be comparable to lacerations resulting from childbirth. We believe, therefore, that Dr. Sweeney, an experienced medical examiner, was properly testifying within her scope as an expert witness.

Furthermore, even had Dr. Sweeney's testimony been excluded, the conviction and sentence were amply supported by the remaining evidence. Therefore, we hold that the trial justice did not abuse his discretion and the motion for new trial was properly denied.

## II

### DEFENDANT'S ANALYSIS OF THE FELONY–MURDER STATUTE

■ The defendant seeks to rewrite statutory law in order to reduce his conviction from first-degree murder to second-degree murder. He argued unsuccessfully at trial below, and reiterates the argument here, that statutory first-degree felony murder requires actual malice aforethought, rather than malice imputed from the felony. Because defendant's malice may only be inferred from the circumstances of the rape, defendant argues that he was entitled to a judgment of acquittal on the charge of first-degree murder.

In *State v. Villani*, 491 A.2d 976 (R.I. 1985), we made it quite clear that any homicide committed during the course of a felony enumerated in § 11–23–1 is first-degree murder. While noting that other jurisdictions have reached the same conclusion by inferring the necessary malice from the elements of the underlying felony, we went on to state that "felony murder is murder in the first degree simply because the Legislature has said so." 491 A.2d at 980.

The defendant tries to distinguish his own case from typical felony murders in

that Alice Carcieri's death was unintentional on his part and due to natural causes. We do not find that these circumstances warrant our construing § 11–23–1 contrary to clear legislative intent.

Next defendant attempts to give new meaning to the statute in order to support his argument for actual malice. The first sentence of § 11–23–1 defines murder as an "unlawful killing * * * with malice aforethought." The second sentence specifies which types of murders are prosecuted as murder in the first degree. Because this sentence uses the word "murder" rather than a neutral substitute such as "killing," defendant argues that the initial definition requiring malice aforethought must be read into this section as a prerequisite for all first-degree murders, including all felony murders.

Although defendant proffers a creative interpretation of the language the Legislature chose to use, he succeeds only in arguing himself into a corner. First, the statute, in defining murder, does not require that the "malice aforethought" be actual. Therefore, defendant must concede that inferred or imputed malice may also fall within the definition. Second, defendant's argument makes the statute meaningless. If all statutory murder required actual malice, then there would be no need for the felony-murder classification because every first-degree-murder conviction would be based on the presence or absence of actual malice, not on any underlying felony. Furthermore, the statute's classification of all other murders as second degree would never apply because, according to defendant's interpretation, the use of the word "murder" in defining second-degree murder implies that they, too, require actual malice aforethought. Therefore, all second-degree murders would actually meet the requirements for first-degree murder, and there would be no such thing as "second-degree murder." The defendant tries to circumvent this absurdity by arguing that when the Legislature used the word "murder" to define first-degree murder, it was referring to the immediately preceding definition, requiring malice aforethought. When it used the same word to define

second-degree murder, however, it was relying on some nebulous commonlaw definition. We do not believe that the Legislature was so arbitrary in its choice of terminology. The defendant focuses on the Legislature's precise use of the word "murder" to define first-degree murder but then ignores the use of the same word to define second-degree murder. Clearly if the Legislature had intended such an interpretation, it would have rewritten the third sentence to read, "Any other *killing* is murder in the second degree." As the Supreme Court of Appeals of West Virginia has recognized, "murder" may signify any homicide. *State v. Sims*, 162 W.Va. 212, 229, 248 S.E.2d 834, 844 (1978).

The defendant also argues that the felony-murder rule is falling into general disrepute. Although this argument might be entertained in other circumstances, this is not an appropriate case for reconsideration of the doctrine. The underlying felony of rape clearly fits within the statute.

III

VALIDITY OF THE IMPOSITION OF THE SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE

The defendant raises two issues regarding his sentence of life imprisonment without parole. First, defendant claims that the trial justice exceeded his authority in finding the aggravating factor of torture, whereas the jury had found only aggravated battery. Second, defendant contends that the sentence was not warranted in this case. We find both arguments without merit.

■ General Laws 1956 (1981 Reenactment) § 12–19.2–1, as amended by P.L. 1984, ch. 362, § 2, delineates the sentencing procedures used when life imprisonment without parole may be imposed. Pursuant to § 12–19.2–1, the jury must find at least one aggravating factor in order to trigger the presentence hearing by the trial justice. After hearing arguments and receiving evidence by both counsel, the trial justice then uses his or her own discretion to sentence defendant. In this case, the trial justice

could have affirmed the jury's single finding in order to sentence the defendant to life imprisonment without parole. In contributing his own finding of torture, however, the trial justice was acting well within the ambit of the statute. Clearly the finding of torture was not essential because the affirmation of aggravated battery was sufficient, but the trial justice did not exceed his authority by creating a new finding. *See State v. Lassor*, 555 A.2d 339, 354 (R.I.1989) (trial justice not bound by threshold determination of jury).

■ Finally defendant argues that his sentence should be reduced from life imprisonment without parole to life imprisonment on the grounds that the sentence is inappropriate in these circumstances. In considering this request, we must don the robes of a trial justice, review the complete record, and exercise our independent judgment and discretion. We must also examine the relevant personal history, character, record, and propensities of the defendant. *State v. Wilson*, 568 A.2d 764, 769 (R.I. 1990); *State v. Travis*, 568 A.2d 316, 325 (R.I.1990).

The defendant contends that the circumstances in this case do not rise to the level of brutality found in the three Rhode Island cases wherein we have previously affirmed the sentence of life imprisonment without parole: *Lassor, Travis,* and *Wilson, supra.* In our independent judgment, however, we find that the circumstances of this case sufficiently support the imposition of this sentence. We believe that the sentence may be imposed even when the resulting death is unintentional and the underlying felony was not intended as torture. Furthermore, we do not find it necessary at this time to draw a dividing line when this case is not so far removed from the so-called core cases, those in which the sentence would unquestionably be imposed. *Cf. Harris v. State*, 237 Ga. 718, 733, 230 S.E.2d 1, 11 (1976) (death sentence should be reserved for core cases in which aggravating circumstances are clear). Were we contemplating a death sentence here, we might be more compelled to draw such a line. *See Lassor*, 555 A.2d at 353 (cases

regarding death penalty may not be analogous).

The trial justice defined aggravated battery as "the malicious causing of bodily harm to another by depriving him or her of a member of his body, or by rendering a member of his or her body useless or by seriously disfiguring his or her body, or a member thereof." *Accord Lassor*, 555 A.2d at 354 (citing definition approved by United States Supreme Court in *Godfrey v. Georgia*, 446 U.S. 420, 431–32 n.13, 100 S.Ct. 1759, 1766 n.13, 64 L.Ed.2d 398, 408 n.13 (1980)). "Torture," the trial justice continued, "requires evidence of serious physical or mental abuse of the victim while he or she remains alive and conscious." We concur in these definitions and shall use them in our own determination.

It is unnecessary to restate the entire record in support of our conclusion; mention of a few salient points should suffice. Alice Carcieri was an elderly virgin, suffering from a heart condition. In his assault defendant tied her to the bedposts by her wrists, thus depriving her of the use of those limbs; her legs had been amputated years earlier. The lacerations to her vaginal area caused her to lose a significant amount of blood, regardless of how her pain was characterized. We cannot underestimate the effect of the assault upon this woman while she was alive and conscious. *See Harris*, 237 Ga. at 732, 230 S.E.2d at 10 (aggravating circumstances comprise both effect on victim and depravity of mind of offender). We also note that Rhode Island has enacted separate statutes that define serious assaults on both the elderly and the disabled as felonies. Section 11–5–10.1, as amended by P.L.1988, ch. 491, § 1; § 11–5–10.2, as amended by P.L.1988, ch. 358, § 1.

The defendant contends that he acted with beneficent intentions, to alleviate Carcieri's holiday loneliness, but his actions are inconsistent with that contention. He did not ask Carcieri if she wanted his peculiar form of help, and as if knowing what her response would have been, he lay in wait until she was alone and then made sure that she could not identify him. He felt her go limp during her ordeal, but he did not stop to comfort her or to call for help. Instead, he left her tied to the bed, ransacked the room to create the appearance of a burglary, and fled. On these facts alone we can gauge the depravity of defendant's mind.

Having satisfied ourselves that aggravating factors were present, we next consider the presence of mitigating factors. The trial justice could not find any, nor can we. The defendant's background demonstrates an avoidance of responsibility and a lack of direction in his life. He has over time quit high school, quit vocational school, and quit the Army. His marriage has been unstable, marked by frequent separations. He has no religious affiliation, uses drugs such as crack, and has something of a criminal record. As we stated above, defendant may have claimed that he intended to help Carcieri, but his actions and the resulting tragedy bespeak otherwise.

On this record we are of the opinion that the trial justice's decision to impose the sentence of life imprisonment without parole was supported by ample evidence. In the exercise of our independent judgment, we affirm the imposition of that sentence.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the imposition of the sentence of life imprisonment without parole is affirmed. The papers of the case are remanded to the Superior Court.