Theodore B. **CHAPDELAINE**

v.

**STATE of Rhode Island.**

No. 2009–135–Appeal.

Supreme Court of Rhode Island.

Dec. 15, 2011.

Kirk Y. Griffin, Pro Hac Vice.

Virginia M. McGinn, Department of Attorney General, for State.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The applicant, Theodore B. Chapdelaine, appeals from a Superior Court judgment denying his application for postconviction relief. On appeal, the applicant contends that the conduct of his retained trial defense counsel constituted ineffective assistance in violation of his Sixth Amendment right to counsel, as provided by the United States Constitution. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Procedural History

In 2003, applicant was charged by criminal information with three counts of second-degree child molestation in violation of G.L.1956 § 11–37–8.3. The applicant pled not guilty, and a jury trial commenced on March 31, 2004. After a two-day trial, the jury found applicant guilty on all three counts. The applicant filed a motion for a new trial, which was denied. He subsequently was sentenced to thirty years at the Adult Correctional Institutions on count 1; consisting of fifteen years to serve and fifteen years suspended, with probation. The applicant also was sentenced to twenty years suspended, with probation, on each remaining count, which sentences both were to run consecutively with count 1. The applicant timely filed a notice of appeal, which ultimately was dismissed for failure to file a prebriefing statement.

■ On September 3, 2008, Mr. Chapdelaine filed a verified application for postconviction relief, alleging ineffective assistance of counsel by his trial defense counsel, Mark Smith, Esq. Specifically, applicant asserted that defense counsel (1) was compromised in his ability to cross-examine the complaining witness's mother because of a conflict of interest, (2) entered into an ill-advised and prejudicial stipulation with the prosecution to pre-

clude either party from introducing evidence that applicant or any person testifying at trial had consumed any alcohol and/or drugs, and (3) failed to present expert witness testimony "to establish the significance of the psychological overlay" that had an impact on the complaining witness. On the day of the hearing, applicant filed an amended application for postconviction relief, adding a fourth ground for relief, which alleged that Mr. Smith "failed to properly communicate and have an informed review of the conduct and product of plea negotiations defense counsel had with the prosecutor." Both Mr. Smith and applicant testified at the hearing. In an order dated March 11, 2009, the trial justice found applicant's claims to be without merit and denied his application for postconviction relief. The applicant filed a notice of appeal; and, following a prebriefing conference, we remanded the case for entry of a final judgment.[1]

Such facts as are pertinent to the issues on appeal will be supplied in the following discussion.

## II

### Standard of Review

■ "[P]ost-conviction relief is available to a defendant convicted of a crime who contends that his original conviction or sentence violated rights that the state or federal constitutions secured to him." *Gordon v. State*, 18 A.3d 467, 473 (R.I. 2011) (quoting *Young v. State*, 877 A.2d 625, 628 (R.I.2005)); *see also* G.L.1956 § 10–9.1–1(a)(1). "This Court will not disturb a trial justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings." *Gordon*, 18 A.3d at 473 (quoting *Bustamante v. Wall*, 866 A.2d 516, 522 (R.I.2005)). "This Court will, however, 'review *de novo* any post-conviction relief decision involving questions of fact or mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights.'" *Id.* (quoting *Bustamante*, 866 A.2d at 522).

■ "This Court adheres to the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), when evaluating claims of ineffective assistance of counsel." *Rodriguez v. State*, 941 A.2d 158, 162 (R.I.2008). To prevail on such a claim under this test, an applicant must establish two criteria. "First, the applicant must 'demonstrate that counsel's performance was deficient, to the point that the errors were so serious that trial counsel did not function at the level guaranteed by the Sixth Amendment.'" *Id.* (quoting *Brennan v. Vose*, 764 A.2d 168, 171 (R.I.2001)). "This prong can be satisfied 'only by a showing that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Vose*, 764 A.2d at 171). "The second criterion of the *Strickland* test requires the applicant to demonstrate prejudice emanating from the attorney's deficient performance such as 'to amount to a deprivation of the applicant's right to a fair trial.'" *Id.* (quoting *Vose*, 764 A.2d at 171). "This prong is satisfied only when an applicant demonstrates that 'there is a reasonable probability that, but for counsel's unpro-

---

1. Although Mr. Chapdelaine filed his appeal before final judgment was entered, we treat it as timely because "this Court has stated that it will treat a premature appeal as if it had been timely filed." *Bleau v. State*, 968 A.2d 276, 278 n. 1 (R.I.2009) (mem.); *see also Brown v. State*, 964 A.2d 516, 526 n. 14 (R.I. 2009) ("We repeatedly have said that we treat premature appeals as timely filed.").

fessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

## III

### Discussion

On appeal, applicant alleges that his Sixth Amendment constitutional rights were violated because of the ineffective performance of his trial defense counsel. Specifically, applicant claims that Mr. Smith (1) failed to have a substantive conversation with him about a particular plea proposal, (2) failed to discern a conflict of interest because of his prior representation of a state's witness, (3) entered into a stipulation that resulted in the preclusion of potential impeachment evidence, and (4) failed to undertake efforts to secure an expert witness. We discuss these claims *seriatim.*

### A

### Plea Negotiations

Mr. Smith testified at the postconviction-relief hearing that he has been a practicing lawyer for thirty-five years, has been the defense attorney at more than 200 criminal jury trials, and has tried twenty to thirty child molestation cases.[2] Mr. Smith said that he had "maybe five or six" meetings with Mr. Chapdelaine prior to the trial. Mr. Smith testified that applicant asserted his innocence at their first meeting and consistently maintained that he was not responsible for the alleged crime. Mr. Smith also testified that at one of these meetings they discussed a previous statement that applicant had made to a police officer, in which applicant had offered to "take a five year suspended, five

years probation disposition." Mr. Smith recalled that applicant "didn't deny" making the statement, and he added that "[the applicant] basically said that he was not responsible, but * * * [h]e wanted to get it behind him, and he would take a disposition for no jail time."

Mr. Smith further testified that approximately a week before the trial was scheduled to begin, the trial justice suggested that he would impose a sentence of four-to-six years of incarceration in exchange for applicant's guilty plea. According to Mr. Smith, he presented this offer to applicant and applicant "indicated that he was not guilty of the actual charges; and so at that particular point, [Mr. Smith] said well, then we're going to have a trial." When Mr. Smith was asked whether he had made a counterproposal to the offered plea, he responded: "I did. * * * That we'll have a trial." When asked if he was the type of attorney who "spends a tremendous amount of time going over plea negotiations [and] offers with clients * * * who tell [him] that they are innocent of the crimes charged," Mr. Smith responded:

> "No. I tell them that this is the offer. If the person changes their position, can you get me something better than that, if they start to [waver] a little bit on their innocence, then I do delve into it further and try to negotiate as best I can, but if the person tells me I didn't do this, they'll tell me once or twice, I'm saying that, you don't have to tell me anymore, here's the offer, you didn't do this, we're going to trial. That's what I usually do."

According to Mr. Smith, if applicant at any point had wavered on his claim of innocence or had said that he was willing to

**2.** Over the years, Mr. Smith admirably has served as court-appointed counsel to numer-ous indigent defendants.

talk about a plea, Mr. Smith would have sought out additional offers but, in his opinion, applicant was not interested in further negotiations. Mr. Smith testified that he was aware that applicant was interested in a non-jail disposition; however, he did not believe that applicant was willing to take any "sort of jail recommendation." Moreover, applicant testified that after Mr. Smith informed him of the offer, applicant stated "no, I didn't do that * * * I ain't taking that, and [Mr. Smith] said * * * good, I already told them that." Additionally, during cross-examination applicant was also asked whether it was "a fair statement that [he] wanted a trial at that time," to which he responded "[y]es."

Mr. Chapdelaine contends on appeal that Mr. Smith, although informing him of the four-to-six-year offer, was ineffective during plea negotiations because he did not provide applicant with any guidance about whether the plea offer should have been accepted or rejected. The applicant also claims that turning down this offer and going to trial was "suicidal." The state counters that Mr. Smith was effective because applicant "never expressed any desire to accept a plea with any sort of jail recommendation attached." Moreover, the state asserts, when Mr. Smith told him about the plea offer, applicant reaffirmed his innocence and refused the offer.

The United States Supreme Court has made it clear that the Sixth Amendment right to effective assistance of counsel attaches during the plea-negotia-tion process. *See Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (holding that the Sixth Amendment right to counsel attaches after the initiation of formal charges). "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. What is "reasonable" depends on "the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the [Sixth] Amendment envisions." *Id.*

"Representation of a criminal defendant entails certain basic duties[:] * * * a duty of loyalty, a duty to avoid conflicts of interest * * * the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

The applicant points to the *"Boria* cases" from the New York state and federal courts and he asserts that they are "precisely on point" to prove that Mr. Smith's representation was ineffective.[3] *See People v. Boria,* 204 A.D.2d 652, 612

---

3. *Boria v. Keane,* 83 F.3d 48, 53 (2d Cir.1996), centered on a "buy and bust" situation where the defendant was arrested for selling cocaine to an informer. The defendant, a first-time offender, was offered a plea bargain of a one-to-three-year sentence in exchange for his guilty plea. *Id.* at 50. The prosecutor warned the defense attorney that if the plea offer was turned down, there would be a superseding indictment for a higher-class fel- ony such that any similar plea offer would be impossible. *Id.* Although counsel informed his client of the finality of turning the plea offer down, he did not discuss with the defendant the advisability of either accepting or rejecting it. *Id.* at 51. The defendant subsequently was convicted on the greater charge and sentenced to twenty-five years to life. *Id.* at 50–51.

N.Y.S.2d 80 (N.Y.App.Div.1994); *see also Boria v. Keane*, 897 F.Supp. 809 (S.D.N.Y. 1995); *see also Boria v. Keane*, 83 F.3d 48 (2d Cir.1996). Although applicant attempts to show similarity between his case and the case at issue in *Boria*, we find the analogy unpersuasive. In *Boria*, 83 F.3d at 51 n. 4, the defense counsel testified that it was his "position and * * * belief that relative to criminal cases * * * a drug case under circumstances of a possession or direct sale to an undercover agent is probably one of the most difficult cases to defend," and he stated that "getting an acquittal in a drug case in upstate New York was almost impossible." The *Boria* court opined that "it would be impossible to imagine a clearer case of a lawyer depriving a client of constitutionally required advice," and consequently reduced the defendant's sentence to time served. *Id.* at 53, 55.

■ Although Mr. Smith admitted that the reality of defending a child molestation case is an uphill battle,[4] we reject applicant's contention that his decision to proceed to trial was "suicidal." Mr. Smith testified that his trial strategy in these types of "typical he said/she said case[s]" is to "listen to what the witness says [at trial], each witness, and gain as much as [he] can to show that it's a fabrication for an ulterior motive other than the actual sexual contact." Mr. Smith was clear that child molestation cases are difficult cases to defend, but in this case we are unable to conclude that applicant has shown that there was little hope for an acquittal. This is especially true in light of the fact that *in limine* motions filed by Mr. Smith on behalf of applicant were granted, which restricted damaging evidence from coming before the jury.

*Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, places the burden on applicant to prove that his "counsel's representation fell below an objective standard of reasonableness." In the case under review, applicant never backed away from his claim of innocence. He maintained his innocence from the point at which he first was informed of the allegations against him, to his first meeting with Mr. Smith, and throughout his trial. The applicant also acknowledged that when Mr. Smith presented him with the plea offer, it still was applicant's desire to have a trial.

While in no way endorsing the manner in which Mr. Smith conveyed the plea offer to his client, we are satisfied that applicant has not shown that Mr. Smith's conduct fell below "an objective standard of reasonableness." Clearly, it would have been preferable for Mr. Smith to impart his professional and experienced advice at the time when he discussed the plea offer with applicant. However, in light of applicant's consistent claims of his innocence and his firm resolve in insisting on a trial, we cannot conclude that trial counsel's performance was so deficient as to constitute ineffective assistance of counsel.

■ Moreover, applicant has failed to show that the result would have been any different had Mr. Smith explained to him in greater detail the advisability of accepting or rejecting the four-to-six-year offer. Thus, applicant also is unable to satisfy the second *Strickland* prong.

## B

### Conflict of Interest

A potential conflict of interest came to Mr. Smith's attention on the first day of the trial. At that time, Mr. Smith first was made aware that eighteen years earli-

---

**4.** Mr. Smith testified that child molestation cases are extremely daunting because "you're

behind the 8–ball before you even start with these accusations."

er he had represented the complaining witness's parents in a medical-malpractice suit that the parents had brought on behalf of their daughter, the complaining witness's older sister.[5] Both the mother and the father were scheduled to testify against applicant at this trial. The applicant testified that Mr. Smith explained the situation to him, "said he'd still represent [him] as best as he could[,] and told [him] it might be a conflict of interest." The applicant testified that he responded, "[W]ell, we're here now. Let's go through with it."

When this potential conflict of interest came to the trial justice's attention, the trial justice directly and carefully questioned applicant about his willingness to have Mr. Smith continue representing him:

"[Trial Justice]: It would appear that the mother of a child who was, in part, represented by your attorney will be testifying in this case. And apparently, this mother, as I'll refer to her, is someone with whom you had some type of friendship or romantic relationship. Recognizing that was about 18 years ago, you still may be uncomfortable with the fact that your attorney, who is going to represent you in this very significant criminal action, did, in fact, represent the mother of the principal complaining witness in this case.

What is your reaction to that, sir?

"[Applicant]: I'm all set with it.

"[Trial Justice]: Are you comfortable having Mr. Smith represent you?

"[Applicant]: Yes.

"[Trial Justice]: Do you recognize that there is a potential conflict here because he did, at least in part, represent a witness who may be called by the [s]tate in this case and may give testimony against you?

"[Applicant]: Yes

"[Trial Justice]: Okay. Do you have any questions of the [c]ourt as to this issue, the issue being that your current attorney represented the sister of the complaining witness in this case as well as the mother of the complaining witness who may be a witness; do you have any questions at all?

"[Applicant]: No, I don't, your Honor.

"[Trial Justice]: Are you completely comfortable with this?

"[Applicant]: Yes.

"[Trial Justice]: Have you had enough time to think about this? This is—this potentially could be a significant issue. I don't know. Do you feel that you've had enough time to mentally and carefully think this thing through?

"[Applicant]: I believe so, your Honor."

On appeal, applicant alleges that he was deprived of effective assistance of counsel because Mr. Smith neglected to appreciate the potential conflict this situation presented, which applicant asserts manifested itself in Mr. Smith's cross-examination of the mother. The applicant argues that because of Mr. Smith's desire to "insulate the reputation of his former client," his cross-examination of her "was ineffective and, in any material respect, aimless."[6]

**5.** Mr. Smith was asked by an out-of-state attorney to act as local counsel on this medical malpractice case. Mr. Smith said he met with the mother "once, maybe twice."

**6.** The applicant also faults his trial counsel for not informing the trial justice that applicant's

girlfriend recently had died, not asking applicant if he was emotionally prepared to proceed, and never giving applicant any examples of what the term "conflict of interest" meant.

 When a defendant contends that his attorney had a conflict of interest during his representation, the "mere 'possibility' of a conflict of interest is not enough to impugn a criminal conviction under the Sixth Amendment * * *." *Simpson v. State,* 769 A.2d 1257, 1266–67 (R.I.2001) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). An "actual" conflict of interest is defined as "one that requires that an attorney 'struggle to serve two masters.' " *Id.* at 1267 (quoting *Cuyler,* 446 U.S. at 349, 100 S.Ct. 1708). To determine whether an actual conflict exists, the Court must look to "whether the attorney's actions were motivated by divided loyalties and whether the attorney's conduct lacked a 'sound strategic basis.' " *Id.* (quoting *Burger v. Kemp,* 483 U.S. 776, 784, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).

Mr. Smith testified at the postconviction-relief hearing about the strategy that he employed in his cross-examination of the complaining witness's father and mother. He explained that he attacked the father's credibility with vigor so he could use the high-conflict divorce that the mother and father went through and the father's "cruel" treatment of his daughter as alternative explanations to the jury as to why the complaining witness would allege she had been molested if it were not true. Mr. Smith further testified that this explanation could be used to "suggest to the jury why [the state has] not proven the case beyond a reasonable doubt." Mr. Smith also explained that he took a different approach when cross-examining the complaining witness's mother. He stated that, with the mother, his approach was "to relax" her because he believed that her testimony "could be helpful" to applicant. He further testified that "[t]o chastise the mother of this child by vigorous cross-examination would achieve no purpose."

 We are satisfied that applicant affirmatively waived any claim of error arising out of the alleged conflict of interest. As the above-quoted colloquy demonstrates, the trial justice explained the circumstances of the potential conflict to applicant and the latter indicated that he wished Mr. Smith to continue representing him. Moreover, we discern no error in the trial justice's findings that Mr. Smith "was not struggling to serve two masters," that his approach "was based on sound strategic consideration," and that there was "no evidence that [Mr.] Smith's actions were motivated by divided loyalties."

## C

### Stipulation to Exclude Evidence of Drugs and Alcohol During Trial

 At the postconviction-relief hearing, Mr. Smith testified about a pretrial stipulation that he entered into with the state. The stipulation—a result of a motion *in limine* Mr. Smith filed on behalf of applicant—precluded either party from introducing evidence of drug or alcohol use by the applicant or any other person testifying at the trial. Mr. Smith explained that his strategy for entering into this stipulation stemmed from his belief that child molestation cases are so prejudicial that "even though the [c]ourt instructs the jury that the [s]tate must prove the defendant guilty, the reality of it is the defendant must prove his innocence." Mr. Smith further testified that although he thought he might have been able to use evidence of drugs and alcohol to show that the witnesses' "ability to recall and recollect was somewhat tainted by the use of drugs and alcohol," he firmly believed that it was more important to keep the evidence out altogether. Mr. Smith explained:

"[T]he damaging aspect was \* \* \* if I get into that area of the alcohol and marijuana, I open the door, and if I do open the door, I can see a decent prosecutor asking the witness, well, you had some beers, yeah, and you smoked some marijuana, yeah, who brought the marijuana to the party, and the fear is the defendant did."

The applicant argues that the stipulation entered into by Mr. Smith and the state restricted applicant's right of confrontation by foreclosing a potential source of evidence for impeachment purposes. The applicant further argues that this agreement was entered into to insulate the reputation of Mr. Smith's former client, the complaining witness's mother, exclusively benefitting the state without reciprocal benefit for applicant.

It is well established in Rhode Island that "neither party may question a witness merely to show that he or she may have consumed some potentially intoxicating substance before an event at issue in the case has occurred." *State v. Rice,* 755 A.2d 137, 148–49 (R.I.2000); *see also State v. Amaral* 109 R.I. 379, 387, 285 A.2d 783, 787 (1972) (holding that evidence of the consumption of an alcoholic beverage is not admissible merely to establish that the witness consumed alcohol before the event at issue, but is admissible to establish intoxication when intoxication itself is at issue). This Court has recognized that "because of the undue potential of this kind of evidence to cause confusion and to be unfairly prejudicial, evidence of the drinking of alcoholic beverages should not be admitted to affect credibility." *Rice,* 755 A.2d at 149 (quoting *Amaral,* 109 R.I. at 386, 285 A.2d at 787).

Here, there was no issue of intoxication in applicant's case. Therefore, any attempt to impeach the complaining witness's mother with evidence that she used drugs or consumed alcohol on the day that her daughter was molested would have been used only to affect her credibility. Undoubtedly, this would have been impermissible.

Mr. Smith originally filed a motion *in limine* to exclude any mention of applicant's statement to a police trooper that "he had been drinking substantial quantities of alcohol and smoking marijuana at the time of the alleged incident(s)." The state announced that it would not object to the motion "if the defendant will agree not to raise it at all during [the] trial with any party or any witness that the [s]tate calls." The trial justice affirmed that "to the extent I allow any testimony in by [the trooper] relative to utterances to [the trooper] by the defendant, we are not going to go into the areas of alcohol and drugs."

Mr. Smith testified at the postconviction-relief hearing that he believed that any mention of applicant either consuming or supplying drugs and alcohol during the day of the alleged molestation would have been "damning" because it would be "the kiss of death." Mr. Smith further expounded: "whether [the state] was adamant that [it] didn't want to get into this, was fine with me, I could care less because I didn't need that kind of evidence to come against [applicant]." Additionally, Mr. Smith testified that he believed that any attempt he made to show that the state's witnesses' ability "to recall and recollect was somewhat tainted by the use of drugs and alcohol" would "open the door" and consequently allow the state to introduce evidence that applicant was the person who brought the drugs to the location of the assault.

This Court "will not meticulously scrutinize an attorney's reasoned judgment or strategic maneuver" in a case in which an applicant has made a claim of ineffective

assistance of counsel. *Brennan,* 764 A.2d at 173. "We are not in the business of second guessing the strategic choices of trial counsel when their choices are clearly reasonable and within the bounds of competent representation." *Id.* (quoting *State v. Brennan,* 627 A.2d 842, 851 (R.I.1993)). In this case, the trial justice found that Mr. Smith's "entry into the stipulation did not fall below an objective standard of reasonableness because it was based on a sound strategic basis." We agree with the trial justice that Mr. Smith's strategy of excluding any mention of drug or alcohol use to protect applicant constituted professionally reasonable judgment.

### D

### Failure to Use Expert Testimony

■ Finally, applicant argues before this Court that Mr. Smith's representation was ineffective because he failed "to explore the use of expert testimony to establish the significance of the psychological overlay impacting the victim." The applicant attests that "[t]here was evidence introduced at trial, and more available, that provided a basis for counsel to undertake an investigative inquiry as to whether or not there were alternative explanations that the victim's allegations were the product of possible psychological issues." The applicant points to numerous examples of testimony given during the course of his trial that could have allowed an expert "to establish explanations for [the complaining witness's] behavior other than the consequences of a sexual assault."

The state counters that Mr. Smith's failure to obtain an expert witness in this case was reasonable because the trial justice found that "the jurors were able to determine credibility based upon the evidence at the trial." The state additionally contends that applicant has failed to indicate how an expert "could [have] assist[ed] the jury or how his or her testimony would have altered the verdict."

■ We have said that a jury will benefit from expert testimony when the subject of such testimony is one "involving special skills and training beyond the ken of the average layman." *State v. Castore,* 435 A.2d 321, 326 (R.I.1981) (quoting *Barenbaum v. Richardson,* 114 R.I. 87, 90, 328 A.2d 731, 733 (1974)). However, when a jury is capable of accurately comprehending facts and circumstances that have been described to them by a non-expert, "there is no necessity for the expert testimony" on that subject. *Id.* (quoting *Barenbaum,* 114 R.I. at 90–91, 328 A.2d at 733).

Evidence was adduced at applicant's trial about the complaining witness's parents' bitter divorce, her volatile relationship with her father, her recent switch to a new school, her depression over having no friends, and her voluntary overdose of diet pills and aspirin, which led to her hospitalization. Mr. Smith used all this evidence during his closing argument to suggest to the jury that the complaining witness was falsely accusing applicant because she "had a very disturbing life" and was seeking "a little sympathy from dad." Mr. Smith suggested this theory to the jury, and there is little doubt that the jurors were able to easily comprehend this theory without the aid of an expert witness.

The applicant points to a Massachusetts case in which, applicant asserts, an expert witness was allowed to testify "in support of alternative explanations from a psychiatric standpoint for the testimony of the victims presented by the prosecution." *See Commonwealth v. Amirault,* 424 Mass. 618, 677 N.E.2d 652 (1997). *Amirault* involved assault, battery, and rape allegations by nine children, ages four to eight, against their daycare provider and staff. *Id.* at 656; *see also Commonwealth*

*v. Amirault,* 404 Mass. 221, 535 N.E.2d 193, 195 (1989). At trial, the parents of the children testified about their children's general symptoms [7] as well as their "extremely sexualized behavior." [8] *Amirault,* 677 N.E.2d at 658. The Commonwealth subsequently presented an expert witness who testified that the children's generalized symptoms were "indicative of trauma" and explained to the jury why young children may delay telling authorities about the abuse they suffer. *Id.* The defendants then presented their own expert in response "who testified that the sexualized behavior and the nonspecific symptoms of trauma could have been the result of something the children saw or were exposed to or could have been produced by other emotional trauma." *Id.* at 659. The defense expert's only reference to the possibility of false allegations was to explain how "improper interviewing techniques could lead to false accusations of abuse." *Id.*

In contrast to *Amirault,* however, the prosecution in the case at bar did not present an expert witness that applicant would have needed to rebut. Nor was there testimony proffered stating that the victim displayed any abnormal behaviors after the incident.[9] Presenting an expert in the way applicant suggests would have been nothing more than an attempt to attack the complaining witness's credibility. Likewise, at the postconviction-relief hearing, Mr. Smith testified that he had "never heard of anyone being able to present psychological or psychiatric evidence by means of an expert to demonstrate the truthfulness or untruthfulness of a complaining witness." This Court previously has held that "[i]t is beyond dispute that a determination of the credibility of a witness is solely within the purview of the jury." *Castore,* 435 A.2d at 326.

 We have observed that although "attorneys have a duty to undertake 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary' * * * the reasonableness of a particular decision by counsel not to investigate must be assessed in light of all of the circumstances of the case." *Larngar v. Wall* 918 A.2d 850, 859 (R.I.2007) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). Moreover, because "a reviewing court should apply 'a heavy measure of deference to counsel's judgments,'" we are satisfied that Mr. Smith's decision not to investigate for the purpose of obtaining such an expert witness was reasonable. *Id.* (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). We conclude, therefore, that the trial justice did not clearly err in finding that applicant had "failed to demonstrate that Mr. Smith's conduct fell below an objective standard of reasonableness."

## IV

### Conclusion

For the reasons set forth in this opinion, we are satisfied that whether the applicant's claims are viewed individually or

---

**7.** These symptoms included "bedwetting, baby talk, pain in their genital areas, headaches and stomach aches, and fearfulness." *Commonwealth v. Amirault,* 424 Mass. 618, 677 N.E.2d 652, 658 (1997).

**8.** This sexualized behavior included "masturbation, sexualized play with dolls, boys sticking their tongues in the mouths of their mothers, and the simulation of sexual acts." *Amirault,* 677 N.E.2d at 658.

**9.** The only evidence of anything that could be construed as "telling" behavior is the testimony by the victim's mother that when she attempted to hug her daughter, her daughter would shrug her away, and her father testified that her attitude became very negative.

collectively, the applicant has not demonstrated that Mr. Smith's representation was deficient. Additionally, the applicant has failed to demonstrate "prejudice emanating from the attorney's deficient performance such as 'to amount to a deprivation of the applicant's right to a fair trial.'" *Rodriguez*, 941 A.2d at 162 (quoting *Vose*, 764 A.2d at 171).

In accordance with the foregoing, we affirm the judgment of the Superior Court denying the applicant's application for postconviction relief. The record shall be remanded to the Superior Court.

Justice INDEGLIA did not participate.