STATE

v.

John M. McKONE.

No. 94–133–C.A.

Supreme Court of Rhode Island.

April 9, 1996.

Annie Goldberg and Aaron Weisman, Asst. Attys. General, for Plaintiff.

Paula Lynch Hardiman and Paula Rosin, Asst. Public Defenders, for Defendant.

## OPINION

BOURCIER, Justice.

This is defendant John M. McKone's appeal from his December 16, 1993 judgment of conviction following a jury-waived trial in the Kent County Superior Court on five consolidated criminal informations charging him with six counts of embezzlement.

### I

### Case Travel and Facts

John M. McKone (defendant) was the president and sole shareholder of M.I.S., Inc. (M.I.S.) a payroll-preparation company. His company was responsible for drafting employee payroll checks, and for making the appropriate state and federal tax deductions therefrom for its various company clients.

M.I.S. also paid the state and federal taxes due for each of those clients. In return, M.I.S. was paid an amount by each client, sufficient to cover the payroll checks and taxes, plus a fee for the payroll preparation and tax services furnished. In September 1991, M.I.S. experienced cash-flow problems and informed its clients that the taxes due on their payrolls could not be paid and that M.I.S. was going out of business. M.I.S. went out of business on September 30, 1991. Immediately thereafter, M.I.S.'s clients began encountering not only unpaid tax notices but also bounced[1] payroll checks. The defendant was subsequently charged in five separate informations with six counts of embezzlement. All were consolidated for purposes of trial. The defendant waived jury trial and was tried in December 1993 before a Superior Court trial justice sitting without a jury.

Lori Rose (Rose), an employee of M.I.S., was the state's primary trial witness. She had originally worked as an accountant for the defendant's father, Raymond McKone, at McKone, Morris & Company. She left there in October 1990 to work at M.I.S. as its payroll manager. Her responsibilities as payroll manager included calculating the taxes due for each of M.I.S.'s clients. She would also pay the clients' taxes and would write out and cut the checks for each of the payrolls for those clients. Rose also signed the various checks, using a signature stamp with the defendant's name, "John M. McKone." On the first or second day after she began her work at M.I.S., she was notified by the Greenwood Credit Union, where M.I.S. maintained its accounts, that M.I.S. did not have sufficient funds on deposit to cover the checks being drawn on the various accounts. Thereafter, Rose was required to deal with the Greenwood Credit Union on an almost daily basis "because there was never enough money in the M.I.S. account to cover the payroll checks."

Rose testified that she continued in her position as payroll manager until July 1991 when she was demoted by the defendant to

---

1. We use the common parlance rather than the more sophisticated "return for reason of insuffi- cient funds" designation.

data-entry clerk. The defendant told Rose that her demotion was due to the fact that she did not know how to fill out the required tax forms, forms that she had previously filled out without complaint since she began working at McKone, Morris & Company in 1987. She also testified that although she was supposed to be technically just a data-entry clerk, she continued to act, at least part-time, as the payroll manager because the person who had been hired to replace her lacked sufficient payroll managerial experience.

Rose testified that on September 17, 1991, a number of envelopes containing the payments for the Rhode Island withholding taxes for all of M.I.S.'s clients were intercepted, at the defendant's request, before being mailed. He informed her that there were insufficient funds to cover the checks. Rose testified that, in her opinion, the reason for the insufficient funds was that she had been ordered by the defendant to make out company checks to pay for what were arguably defendant's personal obligations, including payments to the Warwick Country Club, to the New England Health and Racquet Club, and for defendant's automobile lease payments and doctors' bills.

Rose also testified that on September 20, 1991, three days after failing to mail the clients' withholding-tax payments, the defendant directed her to contact his father, Raymond McKone, for permission to withdraw moneys from Raymond McKone's personal line of credit with the Greenwood Credit Union. That procedure had been done several times in the past. However, this time, Raymond McKone balked and would not permit use of his line of credit. He then ordered both Rose and the defendant to each sign a document that would prohibit either of them from withdrawing any further moneys from the personal line of credit. On that same day the defendant told Rose that M.I.S. was "going to shut the doors." During the course of that week, Rose was contacted by many of M.I.S.'s clients, who were calling her and inquiring why their payroll checks were bouncing. Rose informed those clients that their taxes had not been paid and that M.I.S.,

according to what the defendant had told her, was going out of business.

Various clients of M.I.S. and an employee of the Greenwood Credit Union also testified for the state. They each essentially corroborated Rose's trial testimony on matters upon which they had personal knowledge. After the state rested its case in chief, the defendant offered no defense except to introduce two documents into evidence. Those documents merely showed the authorized signatures for the various M.I.S.'s clients and for the general accounts at the Greenwood Credit Union. The defendant thereafter rested.

The defendant was convicted of all six counts of embezzlement. His motion for judgment of acquittal at the close of the state's case and his subsequent motion for a new trial were both denied. He was sentenced on February 7, 1994, to ten years' imprisonment, with one year to be served and nine years suspended with probation. As a condition of his probation, the defendant was required to make restitution. This appeal followed his judgment of conviction. The defendant asserts five allegations of error on the part of the trial justice. He first contends that the trial justice erred in denying both his motion for judgment of acquittal and his new trial motion.

II

The Motion for Judgment of Acquittal

 At the close of the state's evidence and case in chief, defendant moved for judgment of acquittal assertedly pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. That rule has no application in jury-waived trials and has application "only in cases tried to a jury." *State v. White*, 107 R.I. 306, 313, 267 A.2d 414, 418 (1970). *White* was decided prior to the adoption of our Rule 29.[2] In that case, the defendant had moved for a judgment of acquittal at the conclusion of the state's case and after the defendant had rested. We spoke in *White* to the effect, if any, that the Rule 29 of the Federal Rules of Criminal Procedure might have on our then existing state trial practice

2. September 1, 1972, Rule 59 Super.R.Crim.P.

procedures in view of the defendant's federal motion form. We said then that the federal rule did not impact upon our long established state practice of permitting a defendant at the close of the state's case in an action before a jury to move for a directed verdict but that such a motion was not permitted in a jury waived or nonjury trial case. Later, when our Rule 29 was adopted and became effective, its wording as to abolishing motions for directed verdicts and substituting motions for judgment of acquittal in their place was the same as the Federal Rule 29 that we considered in *White*. Our Rule 29 did not change our long established rule regarding the appropriate motion, namely, the motion to dismiss, available to a defendant in a nonjury or jury-waived trial. The case at bar was jury waived and was heard before a justice of the Superior Court sitting without a jury.

The wording of our Rule 29 indicates clearly that it was intended to apply in only those trials wherein motions for directed verdicts were applicable, namely, jury trials. It reads, "Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place."

Prior to the adoption of our Rule 29 on September 1, 1972, motions for directed verdicts were permitted in criminal cases tried to a jury. *State v. White*, 107 R.I. at 313, 267 A.2d at 418. In *In re Diana P.*, 656 A.2d 620, 623 (R.I.1995), we noted there our concern regarding a motion for directed verdict made in a nonjury trial as opposed to a motion to dismiss, but elected then not to specifically address the motion issue. The facts in this case prompt us to do so at this time.

We are unable to find any judicial decisional precedent in this jurisdiction that has permitted use of a motion for a directed verdict in a nonjury criminal trial. *State v. White*, 107 R.I. at 313–14, 267 A.2d at 418. The absence of such precedent ought to be obvious. Judges do not return verdicts, juries do, and there is no jury available to a trial justice in a jury-waived trial that can respond to any order of verdict direction. Our long established trial procedure practice has been, and remains, that in jury-waived trials in this state, the appropriate motion by which a defendant may challenge the legal sufficiency of the state's trial evidence at the close of the state's case is by motion to dismiss. *Id. See also In re Diana P.*, 656 A.2d at 623.

For purposes of the matter before us on defendant's appeal, the distinction we note and emphasize between what was formerly designated as the motion for a directed verdict and the now designated motion for judgment of acquittal is not simply one of semantics. The trial justice's obligations triggered by a motion for judgment of acquittal in a criminal *jury trial* case and by a motion to dismiss in a *nonjury* criminal trial are totally different from each other in both form and effect.

 In a criminal jury trial setting, the motion for judgment of acquittal, as did the former motion for directed verdict, requires the trial justice to view and evaluate the nonmoving party's evidence in a light most favorable to the nonmoving party and against the moving party. On such a motion, the trial justice is not permitted to weigh the trial evidence or to pass upon the credibility of witnesses. Additionally the trial justice draws from the trial evidence all inferences favoring the nonmoving party and against the moving party. *State v. Harnois*, 638 A.2d 532, 536 (R.I.1994); *State v. Clark*, 603 A.2d 1094, 1097–98 (R.I.1992); *State v. Lamoureux*, 573 A.2d 1176, 1180–81 (R.I.1990). After doing all that, the trial justice is then only required to determine whether reasonable minds in a *jury* might conclude and decide the case issue or issues in favor of the nonmoving party. If the trial justice concludes that a jury might reasonably so find in favor of the nonmoving party, he or she is then required to deny the motion for judgment of acquittal and permit the case to go to the jury.

 In a case tried *without a jury*, a totally different rule of review on the appropriate motion to dismiss comes into play. The trial justice, in ruling upon that motion, acts as the factfinder. In that role, when passing upon the motion to dismiss, he or she is required to weigh and evaluate the trial evidence, pass upon the credibility of the trial

witnesses, and engage in the inferential process, impartially, not being required to view the inferences in favor of the nonmoving party, and against the moving party. After so doing, if the trial justice in a criminal case setting concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt, he or she denies the defendant's motion to dismiss and, if both sides have rested, enters decision and judgment of conviction thereon. If the evidence is not so sufficient, he or she grants the motion and dismisses the case.

In the case before us, the defendant did not present a proper motion at the conclusion of the state's case. We have nonetheless reviewed the trial record to ascertain whether, assuming his motion to have been proper, any error was made by the trial justice in deciding and disposing of the motion. We find no error.

We have undertaken this somewhat extended review of our Rule 29 motion for judgment of acquittal and its impact upon our long established general trial procedural practice to furnish guidance to the bar and the trial justices. We have been prompted to do so by the correct and commendable concern expressed by the trial justice in this case when confronted with a motion for judgment of acquittal in a jury-waived criminal trial. The trial justice's apparent discomfiture is totally understandable and our response herein to his expressed concerns will, we hope, prevent similar occurrences in all future cases. Henceforth, motions for judgment of acquittal in jury-waived criminal trials will be considered legal nullities and be subject to summary dismissal by the trial justice.

### III

### The Defendant's Motion for New Trial

■ At the conclusion of defendant's non-jury trial and within the time provided by rule and statute, the defendant filed his motion for new trial. That motion was denied after hearing by the trial justice. On that motion, the record reveals that the trial justice independently reviewed and noted all the material trial evidence, weighed and assessed the credibility of each of the trial witnesses, exercised his independent judgment upon all the trial evidence that he accepted as being credible, and then determined from his review that the trial evidence was sufficient to support his previous finding of guilt beyond a reasonable doubt. That was his obligation, *State v. Harnois*, 638 A.2d at 536–37, and we find that he performed it without error.

■ This court will on appeal, when reviewing a trial justice's ruling on a motion for new trial defer to the trial justice's findings on both credibility and fact. We will not disturb those findings unless we are convinced that the trial justice overlooked or misconceived relevant and material trial evidence. *State v. Dame*, 560 A.2d 330, 332–33 (R.I.1989).

General Laws 1956 § 11–41–3, as amended by P.L.1991, ch. 138, § 1 defines "embezzlement" as follows:

"Every * * * officer, agent, clerk, servant, or other person to whom any money or other property shall be entrusted for any specific purpose * * * who shall embezzle or fraudulently convert to his or her own use, or who shall take or secrete, with intent to embezzle or fraudulently convert to his or her own use, any money or other property which shall have come into his or her possession or shall be under his or her care or charge by virtue of his or her employment or for that specific purpose * * * shall be deemed guilty of larceny."

■ The three elements necessary to prove embezzlement were set out by this court in *State v. Oliveira*, 432 A.2d 664, 666 (R.I.1981): "(1) that defendant was entrusted with the property for a specific use, (2) that he came into possession of the property in a lawful manner, often as a result of his employment, and (3) that defendant intended to appropriate and convert the property to his own use and permanently deprive that person of the use." The defendant argues here on appeal that the evidence presented by the state fails to demonstrate the existence of those three elements. He asserts that many other people could have committed the crimes for which he was charged and convicted, most obviously Lori Rose, who he claims

had virtually unlimited access to the check-cutting machine and to his signature stamp. Additionally, defendant claims that there was no proof that the allegedly embezzled money was used for his personal use as opposed to corporate use. He also claims that the Warwick Country Club membership could have been used by him for attracting clients and not just for his personal use. Likewise, he makes the same contention regarding his personal car-lease payments. His personal doctor-bill payments by means of company checks he understandably left unexplained. Contrary to his protestations of innocence based on the someone-else-could-have-done-it defense, the record contains more than sufficient evidence from which the trial justice could have concluded that his guilt had been established beyond a reasonable doubt.

The trial record contains uncontroverted evidence that on the first or second day that Rose began working at M.I.S., the "Greenwood Credit Union [called] to tell [her that M.I.S.] didn't have enough money" to pay the payroll checks submitted by the M.I.S clients' employees. Rose had testified at the trial that "there was never enough money in the M.I.S. account to cover the payroll checks." Rose also testified about how she made out checks for the defendant's personal expenses at the defendant's request. Those expenses included the Warwick Country Club, the New England Health and Racquet Club, and defendant's personal doctors' bills stemming from the defendant's eye problems. Rose also testified that she made out checks for the defendant's automobile lease payments. The canceled M.I.S. checks entered into evidence by the state all corroborate Rose's testimony. Those checks indicate, additionally, that other arguably personal obligation payments were made to supermarkets, municipal courts, and Nutrasystems. There were also a number of M.I.S. company checks made payable to the defendant personally.

Rose's trial testimony describing defendant's unorthodox use of M.I.S. moneys was essentially uncontradicted. She described how she was required to withdraw money from defendant's father's personal line of credit in order to cover all the M.I.S. drafts.

She also testified that defendant instructed her not to mail the checks for the payment of clients' Rhode Island withholding taxes. The clients' employees' bounced payroll checks are left unexplained and uncontradicted.

The trial record also contains the independent and impartial testimony of several M.I.S. clients who testified that they paid M.I.S. the amounts requested by M.I.S. in order to cover their payroll expenses, taxes, and fees only to learn shortly thereafter that their payroll checks were bouncing and that many of their taxes were in default, overdue, or not paid in full. The defendant's vulpine defense of attempting to pin the rose on Rose did not impress the trial justice and fails to impress us.

On the basis of the overall trial evidence, the trial justice denied defendant's motions for judgment of acquittal as well as his motion for a new trial. On the motion for judgment of acquittal, the trial justice specifically found that M.I.S.'s clients had provided M.I.S. with all amounts called for in their agreements with M.I.S., but that by the fall of 1991 their payroll checks were bouncing and their taxes were in default. The trial justice also found that "many checks were drawn [from the M.I.S. accounts] for a reason that would arguably be unsupported for any legitimate purpose conducted with the business of M.I.S." The trial justice noted in his decision that although no one knows with absolute certainty whether the many checks drawn on the M.I.S. accounts and payable to defendant or his golf and health clubs or to his personal doctors were for personal or for business use, "reasonable inference[s]" could be drawn that they were "more than likely improper expenditures for that account to those purposes." When funds were insufficient to make tax or payroll payments for clients, expenditures for entertainment and club memberships were clearly improper, whether corporate or personal.

In his decision on defendant's motion for new trial, the trial justice found that "the circumstantial evidence in this case, the court believed at the time of trial and believes today, was so overwhelming as to leave no other conclusion to be drawn from the paper trail introduced into evidence by the state

that this defendant was the person who was responsible for perpetrating the fraud in the accounts of M.I.S. Corporation." The trial justice found further "that the circumstantial evidence in this case as well as the direct evidence of the expenditures made by the defendant from these accounts points to his conviction beyond a reasonable doubt."

We affirm the trial justice's decision. "[T]he findings of fact of a trial justice sitting without a jury are accorded great deference and will not be disturbed unless it is demonstrated that he or she misconceived or overlooked material evidence or was otherwise clearly wrong." *State v. Shatney,* 572 A.2d 872, 876 (R.I.1990)(quoting *Oster v. Tellier,* 544 A.2d 128, 131 (R.I.1988)). We find that the trial justice neither misconceived nor overlooked material evidence and was not clearly wrong. His findings of fact were amply supported by the state's evidence and the reasonable inferences that he was permitted to draw therefrom.

## IV

### Hearsay

■ The defendant's next claim of error is that the trial justice permitted the introduction of prejudicial hearsay evidence. That challenged evidence is alleged to be Rose's testimony that when certain M.I.S. clients had inquired of her as to why their employee and tax payment checks were bouncing, she referred to the defendant as a "crook." Challenged also is the testimony of James McNamara, a justifiably dissatisfied M.I.S. client, who stated that Rose told him that none of his taxes had been paid. Although we agree that the challenged testimony was hearsay, we do not agree that it was prejudicial to defendant, and we conclude that although error, it was harmless error. First, we note that most of the challenged hearsay was in fact otherwise supported by other direct or indirect evidence in the record. Each of the M.I.S. client witnesses testified that his or her taxes had not in fact been paid and that the payroll checks his or her employees had received from M.I.S. contained more rubber than paper. As for the statement by Rose that she believed defendant to be a "crook," that was simply her

personal opinion based upon facts in the record that were available to the trial justice and from which he could conclude his own independent opinion.

In summary disposition of defendant's hearsay contentions, we reiterate that even though defendant is correct in designating the challenged statements as being hearsay, he is incorrect in his assessment of their impact upon the trial justice's findings. Three drops of salt water dropped into an ocean full of incriminating salt water will hardly, if ever, alter that ocean's salinity.

## V

### The Prosecution's Attempts to Admit Allegedly Inadmissible Evidence

■ The defendant next posits that the prosecutor deliberately attempted to elicit inadmissible evidence, thereby warranting dismissal of his conviction. This claim is patently without merit. The defendant asserts that the prosecutor attempted to introduce evidence regarding his alcohol and drug use to establish his probable motive for the embezzlements. We note, however, that defendant made timely objection to the introduction of that evidence and that the trial justice thereafter sustained his objection. We can safely assume that the trial justice, sitting without a jury, was capable of disregarding evidence that he would not permit to be introduced.

A similar situation is found in *State v. Notarantonio,* 622 A.2d 457 (R.I.1993), where the trial justice properly sustained an objection to the admission of a diary she had read prior to her ruling. In that case, which was also a nonjury trial, this court held that a "trial justice, unlike a jury, can disregard prejudicial material if and when he or she determines that material to be inadmissible. To suggest that the experienced trial justice in this case would be incapable of rendering a fair and impartial decision in the case after having read a diary that she later determined to be inadmissible has no support either in logic or in precedent." *Id.* at 458. In this case, the trial justice was as capable of properly disregarding the proffered testimony re-

lating to the defendant's alleged alcohol and drug use as was the trial justice in *Notarantonio.* We conclude that there was no prejudice resulting to defendant from the prosecutor's actions, hence, no error on the part of the trial justice.

## VI

### The Prosecution's Alleged Discovery Violations

The defendant also claims that the trial justice should not have admitted evidence offered by the state that he alleges was not produced during pretrial discovery. After reviewing the record, this court finds no real or substantial discovery violation.

Five checks made out to the defendant and alleged by him to have been provided just prior to trial were admittedly within defendant's possession well before trial. He conceded that fact to the trial justice: "It appears that we have them, Your Honor. They weren't in order." The back of Dr. Corner's check to M.I.S. for $2981.77, the admission of which defendant also attacks, was admitted subject to defendant's continuing objection. However, defendant failed thereafter to make any motion to strike the challenged evidence at the conclusion of the witness's testimony. The computer printout from M.I.S. and the three checks from Persona Management to M.I.S., all of which defendant claims were admitted erroneously, were only marked for identification purposes and not admitted as trial exhibits. In regard to defendant's allegations concerning nondisclosure of the checks later admitted as exhibit No. 46, those allegations are without merit because the prosecution withdrew the one check from that exhibit that had not in fact been timely provided to defendant pursuant to his discovery request.

 The defendant's final discovery challenge is that he was never furnished with the back sides of canceled checks or a check drawn on the Fireman's Association Account and made out to the Rhode Island Division of Taxation. However, as to the Fireman's Association check the defendant admitted that he was not prejudiced by not having that check in his possession. "Well, one particular check, Judge, to be honest not much prejudice. Since there is also some division of taxation problems, but just for the record, it had not been provided." Moreover, there was no specific objection to the admission of that questioned check as a full exhibit.

In regard to the back of the checks, the trial justice recognized that all the checks "at one time were received by the defendant and were in the defendant's possession and processed in one manner or another by the defendant." The trial justice initially found that no prejudice had been demonstrated but then permitted defendant after completion of the day's trial to take and examine the check backs overnight and until 2 p.m. the following day when the trial was scheduled to reconvene. The defendant at the time trial reconvened made no claim of prejudice other than his blanket objection to the admission of the checks on the ground that they had not been furnished during pretrial discovery. Accordingly, in the absence of any claim or showing by defendant of any prejudice resulting to him from the state's alleged discovery shortcomings, his contentions here are without merit.

## VII

### The Admission of Allegedly Irrelevant Evidence

 The defendant's final claim of error is that the trial justice admitted evidence regarding the tax payment amounts made to M.I.S. by its clients. Evidence of those payments was admitted in order to show that clients' money intended for their tax payments by M.I.S. was in fact embezzled by the defendant, and was not used to pay the taxes as per the client agreements with M.I.S. The admission of that evidence was not clearly erroneous and was essential to show that even though M.I.S.'s clients had paid their money to M.I.S. for tax payments, their taxes were never paid, and the clients had to personally cover the outstanding tax obligations. That evidence was clearly relevant to the determination of whether the defendant had embezzled funds from M.I.S. The trial justice did not abuse his discretion in admitting that evidence.

## VIII

### Conclusion

For all the above reasons, the defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the papers of the case are remanded to the Kent County Superior Court.

MURRAY and FLANDERS, JJ., not participating.