June 25, 2024

**Supreme Court**

No. 2021-76-M.P.
(PM 20-8909)

Miguel Tebalan Rivera          :

v.          :

State of Rhode Island.          :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Miguel Tebalan Rivera          :

v.                             :

State of Rhode Island.         :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** We issued a writ of certiorari to review a Superior Court judgment granting Miguel Tebalan Rivera's application for postconviction relief. The state challenges the trial justice's finding of ineffective assistance of counsel, contending that the trial justice (1) overlooked or misconceived evidence that trial counsel advised Rivera that he would need to testify in order to assert that he killed the decedent in self-defense; (2) erred in finding that trial counsel otherwise performed deficiently in "discourag[ing]" Rivera from testifying and in failing to move to exclude Rivera's recorded statement to police; and (3) erred in relying on Rivera's statements at sentencing and in a presentence report to find that trial counsel's performance prejudiced Rivera.

For the reasons set forth herein, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

### The Offense

On the night of December 23, 2015, Rivera entered a Providence Police Department substation, repeatedly insisting that he had killed someone. According to officers who were present, Rivera was "yelling," "very emotional," "crying," and "stuttering." He spoke to officers in Spanish. Officer Eduardo Curi, a Spanish-speaking patrolman, testified that Rivera said "that they made him do it[] [b]ecause * * * they were not giving him a job" and "that they did something to his family in Guatemala." Rivera offered to take Officer Curi to the scene of the killing. Officer Curi placed Rivera in the back seat of his cruiser, uncuffed, and proceeded to Moore Street. Officer Richard Mendez, also a Providence police patrolman, followed behind.[1]

When the officers and Rivera arrived at his apartment building, he gave the officers his keys and directed them to the correct unit. Inside, police discovered the body of Julio Mejia Perez, who lay dead on the kitchen floor. Perez appeared to have been stabbed repeatedly. Detective David Perez, who had responded to the Moore Street location, seized a bloody knife from the top of the refrigerator.

---

[1] At the time of the trial, Officer Mendez testified that he was currently a detective.

## The Recorded Statement

Rivera was arrested and taken into custody. He later made a statement to police. Detective Daniel O'Connell interviewed Rivera with the aid of a Spanish-speaking officer, who acted as an informal interpreter after Rivera indicated that he was not proficient in English.[2]

The two officers initially provided Rivera with a Spanish-language waiver form, describing his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), which Rivera signed. After confirming certain biographical details, Rivera repeatedly and explicitly told the officers that he did not want to talk to them. The Spanish-speaking officer responded that the "truth is * * * what will help you" and continued to question Rivera. In response to the detective's questions, Rivera explained that Perez was someone he knew from Guatemala, his country of origin, who had helped him get a job.

After the Spanish-speaking officer asked how he was paid, Rivera again stated that he did not want to talk to the officers and asked to speak to a lawyer. Detective O'Connell responded by inquiring whether Rivera had a lawyer, to which Rivera replied that he did not, but that he believed, based on the warnings he had been given,

---

[2] The trial justice's decision granting postconviction relief identifies the Spanish-speaking officer who participated in the custodial interview as Officer Curi. We were unable to corroborate Officer Curi's involvement in the interview from the record before us.

that he could be provided with one.  The Spanish-speaking officer persisted in questioning him, asking how the fight started and whether Perez and Rivera were drinking.  Rivera said he did not want to say something that would be used against him.  Detective O'Connell replied that the police "have to give you your rights" and that "no matter if you are not a citizen or not, everyone gets their constitutional rights."  The Spanish-speaking officer explained that those rights were "automatic." The two then continued to interrogate Rivera.

In the disjointed interview that followed, Rivera eventually expressed that he and Perez had been in the apartment for approximately three hours before the fight began.  He claimed that Perez sought to collect money that Rivera did not have and that Perez stated that Rivera had "screwed up" and had no way out.  He characterized Perez as someone who was always intimidating others.

Rivera admitted to having stabbed Perez at least twice with a knife that was on top of the refrigerator.  He also indicated that Perez did not have a weapon.  Rivera commented that he felt guilty, to which the Spanish-speaking officer responded that it was fine, because he was defending himself.  The interrogation ended at 10:13 p.m., having lasted approximately 44 minutes.

**The Statement of Admissions**

In April 2016, a grand jury returned a two-count indictment against Rivera alleging murder, in violation of G.L. 1956 §§ 11-23-1 and 11-23-2, and the

- 4 -

commission of a crime of violence while in possession of a knife with a blade more than three inches long, in violation of G.L. 1956 § 11-47-59.

On May 9, 2017, Rivera's initial counsel was replaced by the attorney whose representation is the subject of Rivera's postconviction-relief application (trial counsel). Trial counsel later testified that Rivera's first attorney withdrew after Rivera rejected a plea of nolo contendere to second-degree murder. Trial counsel averred that, when she began representing Rivera, her understanding was that he did not want to enter that plea because he wished to assert self-defense at trial.

The month that she began representing Rivera, trial counsel drafted a document titled "Statement of Admissions." Rivera signed the statement, which was styled as an affidavit, before a notary on May 26, 2017. It declared Rivera's intention to waive his right to a jury trial and to admit that, on "December 23, 2015, at 121 Moore Street 3[rd] floor in the City and County of Providence, [he] did stab Julio Mejia Perez who was born on May 9, 1979, multiple times, with a kitchen knife which was later recovered from that location, which was the proximate and actual cause of his death." It concluded: "I do not waive my right to trial by a judge sitting without a jury on the issue of *mens rea* – that is, whether I had criminal intent."

At a June 2017 hearing, which was conducted by a different justice than the one who would eventually oversee his trial, Rivera affirmed his desire to waive his

right to a jury trial. Trial counsel also read the statement of admissions into the record. The Superior Court justice accepted Rivera's jury waiver and admissions.

Other than motions for discovery and inspection, trial counsel did not file any pretrial motions. In the time between the jury waiver hearing and trial, another justice was assigned to the case (the trial justice).

## Trial

Rivera's jury-waived trial proceeded over October 17 and 18, 2018. On the first day, trial counsel submitted the statement of admissions to the court.

The state presented five witnesses: Officer Curi; Detective—formerly Officer—Mendez; Detective Perez; Patricia Ogera, M.D.; and Detective O'Connell.

Officer Curi and Det. Mendez described their initial encounter with Rivera in the substation and the events leading up to the discovery of the body. Detective Mendez and Det. Perez related their observations and actions inside Rivera's apartment, where police collected evidence after obtaining a warrant. Detective Perez also testified that, when Rivera was photographed as part of the booking process, he appeared to have no injuries.

Doctor Ogera, the medical examiner, detailed her visit to Rivera's apartment with police and her findings from Perez's autopsy. She reported observing five "sharp force" wounds of various depths on Perez's body, at least two of which pierced bone. Each of these wounds, she opined, could potentially have been fatal

on their own, although the likelihood that each would have resulted in death varied. One, however, would have been fatal in and of itself within "less than five minutes." She also characterized one laceration as a potential "defensive wound" based on its location on Perez's forearm. Doctor Ogera agreed with trial counsel that the presence of a "defensive wound" on his left forearm might "suggest" that Perez was conscious at the time of the attack, although she could not say so to a reasonable degree of medical certainty. She similarly could not opine as to whether Perez was upright or lying down when he was stabbed.

Finally, Det. O'Connell testified that police submitted a buccal swab collected from Rivera to the Department of Health. The state then read a stipulation into the record concerning the conclusions of DNA testing conducted by the Department of Health. The state rested after having read Rivera's statement of admissions into evidence.

At the close of the state's evidence, Rivera moved to dismiss pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, sometimes called a *McKone* motion in reference to *State v. McKone*, 673 A.2d 1068 (R.I. 1996). Rivera asked the trial justice to dismiss the murder charge or to reduce it to a lesser-included offense. Trial counsel argued that the state had not "shown adequate mens rea to convict Mr. Rivera of any crime." After making its argument as to second-degree

murder, the state conceded that Rivera's motion should be granted as to murder in the first degree.

Of note, at the end of counsels' arguments, but prior to the trial justice's decision, trial counsel submitted to the trial justice that "as of this moment," Rivera "does not wish to" testify. The trial justice replied that "we are not there yet" and that she would rule on the motion to dismiss first, "[a]nd then he can make his decision."

Citing the state's concession, the trial justice granted the motion to dismiss the first-degree murder charge and denied the motion with respect to second-degree murder. After outlining the relevant standard for a motion to dismiss, she found that, given the statement of admissions, the state had proved second-degree murder beyond a reasonable doubt, citing its evidence of "the nature of the wounds, the nature of how [Perez] died, the number of wounds, the fact that [Perez] was conscious, [and] the fact that * * * there was some type of struggle [that] continued * * *." The trial justice concluded by stating that, "if no further evidence was offered to rebut" the state's case, she would find that the state had met its burden as to second-degree murder.

After a recess, during which trial counsel met with Rivera, trial counsel requested that the trial justice ask him whether he would testify. In response to the trial justice's questioning, Rivera affirmed that he had spoken to his attorney

- 8 -

regarding his decision and that he "believe[d] [he was] not going to testify." After a brief colloquy, the trial justice found that his decision was knowing, intelligent, and voluntary.

Trial counsel rested her case, stating that she would present no witnesses or evidence and that she would "renew" her motion to dismiss. In a closing statement, trial counsel again argued that the state had not proven *mens rea* for second-degree murder beyond a reasonable doubt. She further asserted that the state had failed to prove beyond a reasonable doubt that Rivera had not acted in self-defense.

After the state's final argument, the trial justice found Rivera guilty of second-degree murder and commission of a crime of violence while in possession of a knife with a blade longer than three inches. She reiterated that "the number of wounds" and the "depth" of those injuries "in and of itself demonstrates intent to kill" and that the state had thereby proven *mens rea* for second-degree murder. She also noted that, although "in final argument" trial counsel "mentioned that it could have been self-defense[,] * * * there's not an iota of evidence of self-defense in this case." Trial counsel filed a motion for a new trial on October 24, 2018, which was denied.

### Sentencing

On October 31, 2018, Rivera was interviewed by a probation officer in the presence of trial counsel. The resulting presentence report includes an account by Rivera of his conduct on the night of the homicide. According to the report, Rivera

described Perez "as an intimidating individual and a 'criminal' who offered to obtain drugs for him previously" with a "tough reputation," whom Rivera was "frightened of" but who had "obtained a job for" Rivera on the Newport waterfront. Rivera reportedly characterized Perez as a person who "enjoyed humiliating him" and who "attempted to manipulate and 'control' him," whose "mistreatment culminated in the instant offense * * *."

The report recounted Rivera's claim that, on the night of Perez's death, "[h]e and [Perez] had been drinking alcohol when [] Perez asked him for money." Both "were drunk" and Perez's request "became a demand." When Rivera "answered that he had no money, [] Perez stood, approached and threatened him, saying he was going to, 'fuck [Rivera] up.'" Rivera alleged that he "tried to leave but [Perez] grabbed" him and that Perez "lunged at him and began strangling" him. Rivera "los[t] consciousness temporarily before realizing [that] he was in no ordinary fight" and believed that "[i]t was either him or me" when he "grabbed the knife."

A sentencing hearing was held on January 16, 2019. While addressing the trial justice with the assistance of an interpreter, Rivera again made certain claims about the night of Perez's death. He alleged that Perez "was asking for money from [Rivera] because of the job that he had gotten" him. He said that he told Perez that he "still hadn't been paid for [his] work" and that Perez then "became furious" and told Rivera: "Now I'm going to kill you." Rivera continued that, when he "saw that

[Perez] stood up, he said [this] in a serious way and he stood up[,]" he "felt very afraid." He claimed that he "looked for the door, trying to get to the door," but that Perez "grabbed" him "from behind by the shirt and he put [Rivera] in front of him." He "felt that [Perez] was a very strong man," and he "thought what am I going to do at this moment." He then "remembered a knife that was over the freezer."

He stated that, when Perez "put [Rivera] in front of him and * * * raised his hands toward [Rivera's] throat, [Rivera] grabbed the knife and [] stabbed [Perez] one time in the chest." Then, when Perez "felt the stab, he said * * * [t]oday you screwed me up, but I'll kill you too" and "grabbed" Rivera "so strongly, [that] [Rivera] gave him another [stab with the knife], and maybe more that" he did not remember. Apparently referring to the forearm injury described by Dr. Ogera as a possible defensive wound, Rivera stated that "when [he] gave him the last stab, [Perez] lowered his hand and that's when he wounded his arm," positing that "[i]t wasn't that [Perez] was trying to defend himself."

Rivera continued that, when Perez "was on the ground, [he] lost [his] mind" and was "so desperate" that he "didn't think of calling the ambulance" and that all he "thought [about] was getting outside." Then, "once [he] was outside, all [he] thought of was going to the police." He concluded by professing that he "just wanted to be clear that this wasn't something that I wanted to do in my thoughts," but rather,

"[i]t was simply that he came after me, he grabbed me by the throat, and then I defended myself." He reiterated once more that he "only defended [him]self."

After this allocution came to an end, the trial justice commented that Rivera had "just articulated a defense of self-defense." She remarked that she was "just baffled"; she said that, given the statement of admissions, "there was nothing left" for Rivera to contest "absent an affirmative defense," but that Rivera had never actually "articulate[d] that defense" at trial.

The trial justice described the case as proceeding "as though it was presented as a plea, but the only one in the room who didn't understand that was the [d]efendant." "[B]ecause the case was presented in such a way," she did not believe that she could consider Rivera's account of self-defense, which had not been given under oath or cross-examined, at sentencing. She sentenced Rivera to sixty years of incarceration, with fifty to serve and the balance suspended, with probation, with a concurrent term of five years to serve on the other count.

Rivera filed a notice of appeal on January 23, 2019. Represented by new counsel, he withdrew that appeal on July 26, 2019.

**Postconviction Relief**

On August 1, 2019, Rivera filed an application for postconviction relief requesting vacation of his conviction based on trial counsel's ineffective assistance. Among other allegations, Rivera claimed that trial counsel "failed to advise" him

that, "unless [he] testified at trial, there would be no evidence of self-defense and that, given the 'Statement of Admissions,' the result after trial would inevitably and necessarily be a guilty verdict on second[-]degree murder." He argued that there is "a reasonable probability that the outcome here would have been different with constitutionally sufficient representation[,]" asserting that he "had a viable defense of self-defense." Rivera appended transcripts of the trial and of the hearings concerning his original jury waiver and stipulations, new trial motion, and sentencing.

Trial counsel was deposed on September 24, 2020. She recounted that Rivera's first attorney had negotiated a plea of nolo contendere to second-degree murder and that she had been appointed after a "dispute" with that attorney. When she began representing Rivera, she averred, it was her "clear impression * * * that it was [] Rivera's intent and his wish, and the thing that prevented the plea from being taken was that he wanted to express his story of what happened in the kitchen at Moore Street."

Trial counsel recounted how, to her memory, Rivera had described the events leading up to Perez's death in their attorney-client meetings. Of note, she confirmed that Rivera primarily spoke Spanish, that she did not speak Spanish, and that she communicated with him with the assistance of an interpreter whenever they met in

the Adult Correctional Institutions, but that she did not use an interpreter for every discussion with Rivera.

Trial counsel explained that her "understanding from" Rivera was that his "job had been arranged by" Perez, but that Rivera "was very unhappy with" Perez "because of the way he was treated in this job" and because Perez "hadn't been placing him in better jobs or more jobs." According to trial counsel, Rivera told her that "on the day that the death occurred," Perez "had insisted upon coming to the house, and [] Perez had insisted that [Rivera] buy beer, which [he] did not want to do." Rivera purportedly claimed that he had "had to sell a * * * piece of equipment to get the beer to buy to satisfy [] Perez." She recalled Rivera "insisted to [her] that he himself was not drunk, that [] Perez was drunk, and he had been drinking beer in the kitchen."

She testified that Rivera asserted that, while he was "standing next to the refrigerator," Perez "came up to [] Rivera and put his hands either at or near [] Rivera's throat and said words to him, which he told me were, I'm going to fuck you up, but that [] Rivera interpreted that as I'm going to kill you, and at that moment * * * [Rivera] reached up behind himself, grabbed the knife off the top of [the] refrigerator, brought his hand down, and from below stabbed Jose Perez, and beyond that [] Rivera had no recollection of what happened next." She also testified regarding a note in her file indicating that Rivera "told me [Perez] put his hands on

[Rivera's] neck prior to [the] stabbing" and Rivera "told me he acted in self-defense."

Trial counsel further stated, however, that Rivera's sentencing allocution, which she characterized as an account of a "combat between him and * * * Perez in the kitchen" in which Rivera "had to inflict five stab wounds just to prevent [] Perez from killing him," was "the first time" Rivera "had ever said in my hearing that the scene unfolded that way."

Trial counsel also testified regarding her decision not to file any motions to suppress based on the recorded statement. She explained that, after reviewing the statement, she had concluded that it was "completely inconsistent with * * * self-defense[,]" explaining that "[t]here [was] no way to overcome the fact he didn't tell the police there had been an attack or a threat." She thus "wanted to keep [the recorded statement] away from the trier of fact at all costs." She testified that the prosecuting attorney's off-the-record agreement not to use the statement in the state's case-in-chief obviated the need for a motion to suppress. She also indicated that she filed no related motion to suppress, and did not seek to put her agreement with the state's attorney on the record, because she "didn't want to have a hint" that a statement existed "before the trier of fact[,]" commenting that if the trial justice "had known there was a statement I was trying to suppress, I don't think that would have helped [] Rivera."

Trial counsel discussed the advice she gave to Rivera regarding his decision whether to testify. She was emphatic that she was "very scrupulous not to influence that decision at any point." She recounted that, "when the [s]tate rested and we broke for lunch, I said to [] Rivera, now you have to decide what you're going to do, are you going to testify or not * * *." Then, after they returned to the courtroom, and the trial justice "asked him whether he was going to testify," Rivera "looked at" trial counsel, and she told Rivera: "[I]f you testify, you will be impeached with the statement that you made to the police. So your testimony must be absolutely honest." Then, to trial counsel's "surprise, he said to the [trial justice] he did not wish to testify." She claimed that, "until that moment," she "expected that he would testify."

Trial counsel agreed that, given the evidence that came out at trial, testifying was the "only way" Rivera could establish the necessary scintilla of evidence required to assert self-defense. *See, e.g.*, *State v. Pineda*, 13 A.3d 623, 634 (R.I. 2011) ("[T]he record as a whole must contain at least a scintilla of evidence supporting the defendant's theory that he used the weapon in self-defense."). When asked whether she explained this concept to her client, she replied that Rivera "knew he had to testify if he wanted to use * * * self-defense[,]" but that he "also knew that if he testified, he would be impeached, and that was the impossible position he was in." When queried as to whether, "as a matter of law," Rivera would at least have

had "a shot" at acquittal if he had testified, trial counsel responded: "As a matter of law, if he testified, he would have been impeached."

Trial counsel opined that, given the "devastating" impeachment power of the recorded statement, Rivera made a "wise decision" and chose "the best option" in forgoing his right to testify. She suggested that, beyond the recorded statement's power to undermine Rivera's self-defense narrative, it could also have exposed him to a first-degree murder conviction because, in the custodial interview, Rivera "described his grievance against" Perez as "being about money and not about a threat."

Trial counsel discussed her actions after the motion to dismiss had been denied and Rivera had told the trial justice that he would not testify. When asked whether she ever explained to Rivera that he was "100 percent certain to lose the trial at that point" if he did not testify, trial counsel replied that she "did not" so advise him. She elaborated that she did not believe that he *was* "100 percent certain to lose the trial," because, in her view, the state "still had to prove mens rea." She also explained that she did not consider asking for a continuance at that point because "[i]f [she] had felt he was unsure of his answer, [she] would have, but he was certain." She had previously agreed that, by the time of trial, she did not intend to introduce any defense evidence besides, potentially, Rivera's testimony.

On December 10, 2020, Rivera filed a memorandum in support of his application for postconviction relief. In relevant part, he now alleged that trial counsel performed deficiently in "fail[ing] to recognize and explain to [him] that if [he] did not testify, he would—as a matter of law—be convicted of second-degree murder." He also argued that his statements in the presentence report and at the sentencing hearing showed that, had he "understood the inevitable result of not testifying (i.e., zero percent chance of acquittal), it is beyond implausible to imagine that [he] would have agreed to continue the trial without testifying." Rivera supplemented his memorandum with his recorded statement to police, an English transcript of that statement, a transcript of trial counsel's deposition, and exhibits from that deposition.

As discussed further below, the state's memorandum opposing relief was neither filed in the Superior Court nor provided to this Court.[3] No evidentiary hearing was held, and the record does not reveal a request from either party for such a hearing.

In a written decision issued on December 30, 2020, the trial justice granted Rivera's application and vacated his conviction and sentence. The trial justice

---

[3] We note that the postconviction-relief statute requires that the attorney general "respond by answer or by motion" to an application for postconviction relief within twenty days "after receiving notice of the docketing of the application, or within any further time the court may fix * * *." General Laws 1956 § 10-9.1-6(a).

- 18 -

discussed Rivera's recorded statement in custody at some length, commenting that there was "no question that the conduct of the officers was illegal, outrageous, and abusive." Having reviewed the transcript of the statement, moreover, she was "unconvinced that it was as damaging to Rivera's self-defense claim as his trial counsel contends[,]" opining that "nothing contained in that statement justified abandoning his self-defense claim." She stated that, if the recorded statement had come before her on a motion *in limine* or for impeachment, she would have "discounted or totally disregarded the evidence due to the deliberately illegal manner in which the interview was obtained."

The trial justice stated that "[t]his [c]ourt finds that Rivera would not have waived the right to testify if he had been advised adequately of the ramifications of that decision, making his decision less than knowing, voluntary, and intelligent." Having read Rivera's statements in the presentence report, which he "elaborated on" at the sentencing, the trial justice was "convinced" that Rivera "always expected to have the opportunity to present a defense * * *." Trial counsel, however, "failed to explain to her client that his silence would seal his fate and result in a conviction." By not testifying, "Rivera would be conceding the case, something he consistently claimed he did not want to do."

The trial justice further held that, "[h]ad Rivera testified and presented a version of events consistent with his allocution at sentencing, there exists a

reasonable probability that the result of the proceeding would have been different[,]" in that "it is reasonably probable that this trial justice may have accepted his claim of self-defense." She stated that Rivera's allocution was "very compelling," that he "had no prior criminal record that could have been used to impeach him if he testified," and that his "version of events [was] buttressed by the fact that he did not flee after the killing but ran to the police station confessing the killing and urging them to accompany him to the scene."

An order granting Rivera's application for postconviction relief and vacating his convictions and sentence entered on January 8, 2021, with the related judgment following on February 2, 2021.

The state petitioned for a writ of certiorari on April 2, 2021, which this Court granted on February 21, 2022. On August 17, 2021, Rivera submitted the presentence report, which had previously been ordered sealed by the trial justice, to the record.

## II

### Standard of Review

"It is well settled that this Court's 'review of a case on certiorari is limited to an examination of the record to determine if an error of law has been committed.'" *State ex rel. Coventry Police Department v. Charlwood*, 224 A.3d 467, 469-70 (R.I. 2020) (quoting *Sandy Point Farms, Inc. v. Sandy Point Village, LLC*, 200 A.3d 659,

662 (R.I. 2019)). "When conducting such a review, this Court does not 'weigh the evidence on certiorari,' but rather, limits its review to 'questions of law raised in the petition.'" *Id.* (quoting *Sandy Point Farms, Inc.*, 200 A.3d at 662).

"[T]his Court 'will not disturb a trial justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings.'" *Santos v. State*, 91 A.3d 341, 344 (R.I. 2014) (quoting *Bell v. State*, 71 A.3d 458, 460 (R.I. 2013)). "We will, however, review *de novo* any post-conviction relief decision involving mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights." *Id.* (deletion omitted) (quoting *Bell*, 71 A.3d at 460). "Even when applying the *de novo* standard of review to such issues, however, we still accord a [trial] justice's findings of historical fact, and inferences drawn from those facts, great deference." *Navarro v. State*, 187 A.3d 317, 325 (R.I. 2018) (deletion omitted) (quoting *Jolly v. Wall*, 59 A.3d 133, 138 (R.I. 2013)).

## III

## Discussion

We now consider whether the trial justice erred in granting postconviction relief based on a finding that trial counsel was ineffective.

"Under Rhode Island law, a defendant can seek postconviction relief pursuant to [G.L. 1956] § 10-9.1-1. Postconviction relief 'is available to a defendant

- 21 -

convicted of a crime who contends that his original conviction or sentence violated rights that the state or federal constitutions secured to him.'" *Navarro*, 187 A.3d at 324-25 (quoting *Bell*, 71 A.3d at 460).

"Accordingly, in all criminal prosecutions, one who alleges the infringement of his or her constitutional Sixth Amendment right to the assistance of counsel may avail his or herself of the postconviction-relief process." *Navarro*, 187 A.3d at 325 (quoting *Rice v. State*, 38 A.3d 9, 16 (R.I. 2012)). "The burden of proving, by a preponderance of the evidence, that such postconviction relief is warranted falls on the applicant." *Id.* (brackets omitted) (quoting *Motyka v. State*, 172 A.3d 1203, 1205 (R.I. 2017)).

"This Court adheres to the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 * * * (1984), when evaluating claims of ineffective assistance of counsel." *Navarro*, 187 A.3d at 325 (quoting *Chapdelaine v. State*, 32 A.3d 937, 941 (R.I. 2011)). "In order to prevail on a claim of ineffective assistance of counsel, an applicant must satisfy two criteria." *Id.* at 326.

"First, the applicant must demonstrate that counsel's performance was deficient, to the point that [her] errors were so serious that trial counsel did not function at the level guaranteed by the Sixth Amendment." *Navarro*, 187 A.3d at 326 (quoting *Chapdelaine*, 32 A.3d at 941). "This prong can be satisfied only by a

showing that counsel's representation fell below an objective standard of reasonableness." *Id.* (quoting *Chapdelaine*, 32 A.3d at 941). Specifically, "in light of all the circumstances, the identified acts or omissions" of trial counsel must fall "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "In our evaluation of counsel's performance, 'a strong presumption' exists 'that an attorney's performance falls within the range of reasonable professional assistance and sound strategy.'" *Navarro*, 187 A.3d at 326 (deletion omitted) (quoting *Rivera v. State*, 58 A.3d 171, 180 (R.I. 2013)).

"Second, the defendant must show that the deficient performance prejudiced the defense." *Navarro*, 187 A.3d at 326 (quoting *Neufville v. State*, 13 A.3d 607, 610 (R.I. 2011)). "This prong is satisfied only when an applicant demonstrates that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bell*, 71 A.3d at 460 (quoting *Chapdelaine*, 32 A.3d at 941-42). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

At oral argument, the state indicated that it had provided the trial justice with a memorandum opposing Rivera's application for postconviction relief. Such a memorandum, however, is not part of the record on appeal, nor does the docket reflect that it was ever filed with the Superior Court. This raises the question of whether the issues argued by the state on appeal were properly presented to the trial

justice. *See State v. Diefenderfer*, 970 A.2d 12, 30 (R.I. 2009). In light of the representations made by counsel for the state and the fact that Rivera does not suggest that the state has waived any of its appellate arguments, we address those arguments on the merits. As explained *infra*, however, we decline to discuss the state's evidentiary objections to the trial justice's consideration of Rivera's presentence report and sentencing allocution.

## Deficient Performance

As a threshold matter, the state and Rivera differ sharply regarding the "acts or omissions" relied on by the trial justice in finding deficient performance. *Strickland*, 466 U.S. at 690. The state contends that the trial justice held trial counsel to be ineffective because: trial counsel did not "advise Rivera that by waiving his right to testify, he would be waiving his right to present his claim of self-defense"; trial counsel "'discouraged' Rivera 'from testifying by focusing on the dangers that awaited him if he did so because he would be confronted with his police interview'"; and trial counsel did not move to preclude or limit the use of Rivera's recorded statement. Rivera counters that the trial justice based her finding of deficient performance on trial counsel's failure to advise Rivera that he would be convicted of second-degree murder if he did not testify.

We need not determine the basis of the trial justice's holding of deficient performance. "[T]his Court may exercise 'its prerogative to affirm a determination

of a trial justice on grounds different from those enunciated in his or her decision.'" *Lerner v. Ursillo*, 765 A.2d 1212, 1216 (R.I. 2001) (quoting *Ogden v. Rath*, 755 A.2d 795, 798 (R.I. 2000)).  It is our view that, "in light of all the circumstances," trial counsel's failure to advise Rivera that, after the motion to dismiss was denied, he would be convicted if he did not testify, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  We emphasize that trial counsel's deficient advice did not stem from any strategic consideration, but from an unreasonable mistake of law as to the effect of the denial of the motion to dismiss.

"Our long established trial procedure practice" is that "in jury-waived trials in this state, the appropriate motion by which a defendant may challenge the legal sufficiency of the state's trial evidence at the close of the state's case is by motion to dismiss." *McKone*, 673 A.2d at 1072 (emphasis omitted); *see* Super. R. Crim. P. 29(b) ("In a case tried without a jury, a motion to dismiss may be filed at the close of the [s]tate's case to challenge the legal sufficiency of the [s]tate's trial evidence.").

"As this Court has previously noted, a motion to dismiss differs from a motion for a judgment of acquittal." *State v. Forand*, 958 A.2d 134, 140 (R.I. 2008).  A motion to dismiss requires the trial justice to "weigh and evaluate the trial evidence, pass upon the credibility of the trial witnesses, and engage in the inferential process, impartially, not being required to view the inferences in favor of the nonmoving

party, and against the moving party." *Id.* at 141 (quoting *McKone*, 673 A.2d at 1072-73). "After so doing, if the trial justice concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt, he or she denies the defendant's motion to dismiss and, *if both sides have rested, enters decision and judgment of conviction thereon.* If the evidence is not so sufficient, he or she grants the motion and dismisses the case." *Id.* (deletion omitted) (emphasis added) (quoting *McKone*, 673 A.2d at 1073).

When trial counsel was asked whether, after the motion to dismiss had been denied, she ever advised Rivera that, "at that point," "he was 100 percent certain to lose the trial" if he did not testify, trial counsel responded that she "did not" do so, positing, incorrectly, that the state "still had to prove mens rea." "An attorney's ignorance of a point of law that is fundamental to [her] case combined with [her] failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland.*" *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).[4] Of note, trial counsel's deposition testimony evinces that she planned to offer no evidence other than, potentially, Rivera's testimony. It thus appears that

---

[4] The trial justice outlined the standard for a motion to dismiss in her decision and went so far as to tell trial counsel that, if the defense rested without introducing evidence, she would find that the state had met its burden on second-degree murder. The trial justice's choice to take this prophylactic step plays no part in our finding that trial counsel's mistake of law, and subsequent failure to adequately advise Rivera as to the effect of the denial of the motion to dismiss, fell below the Sixth Amendment's standard of reasonable professional assistance.

trial counsel misunderstood the effect of the trial justice's denial of the motion to dismiss and that she consequently failed to warn Rivera that a waiver of his right to testify would lead to immediate conviction.

The state contends that trial counsel "knew that * * * [Rivera] could not succeed unless he testified" and emphasizes her claim that Rivera also "knew that he would have to testify." Under these circumstances, reasonable professional assistance required more. "From counsel's function as an assistant to the defendant derive * * * duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688. Trial counsel was obliged to recognize and advise Rivera of the clear, indisputable impact of the denial of the motion to dismiss on his decision whether to testify.

The state also suggests that trial counsel may have had strategic reasons for wishing for Rivera to waive his right to testify, such as the risk that the trial justice would have imposed a longer sentence based on a finding that Rivera perjured himself. Although we do not believe that trial counsel purposefully withheld legal advice regarding Rivera's decision whether to testify in order to sway him towards a seemingly more desirable outcome, such a decision could not properly be understood as a tactical one. Most decisions before and at trial are entrusted to the defense attorney's professional judgment. "Trial management is the lawyer's

province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018) (quoting *Gonzalez v. United States*, 553 U.S. 242, 248 (2008)). "Some decisions, however, are reserved for the client," including whether to "testify [o]n one's own behalf * * *." *Id.* Those decisions "are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." *Id.* In the case at bar, trial counsel recognized that it was Rivera's choice whether to testify. But effective assistance requires a defense attorney to provide the legal advice necessary to making her client's choice an informed one.

Moreover, any potential strategic decisionmaking by trial counsel on this issue could not be disentangled from her mistake of law. An attorney's "strategic choice[] *made after thorough investigation* of law and facts relevant to plausible options [is] virtually unchallengeable" and even those strategic choices "made after less than complete investigation are reasonable * * * to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91 (emphasis added). But decisions based on an attorney's unreasonable mistake of law constitute deficient performance. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) ("Counsel's failure to request discovery * * * was not based on

- 28 -

'strategy,' but on counsel's mistaken belief[] that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense * * *."); *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (noting that defense attorneys performed deficiently when they "failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records").

Trial counsel's mistake of law, and consequent failure to advise Rivera that a conviction would enter if he chose not to testify, "fell below an objective standard of reasonableness" and amounted to constitutionally deficient performance under *Strickland*. *Navarro*, 187 A.3d at 326 (quoting *Chapdelaine*, 32 A.3d at 941). Because, as we discuss below, this error is ultimately dispositive of both prongs of *Strickland*, we address no other potential bases for a finding of deficient performance.

**Prejudice**

The state claims that Rivera provided insufficient evidence that counsel's errors prejudiced him. It alleges that Rivera's statements at sentencing and in the presentence report (the exculpatory statements), which were not given under oath or subject to cross-examination, are "inadmissible." It also contends that that the trial justice erred in "accept[ing] Rivera's unsworn and self-serving recitations at face

value and implicitly * * * [finding] them to be both accurate and credible without providing the [s]tate the opportunity to cross-examine Rivera about [his] version of events."

In turn, Rivera contends that the exculpatory statements present "consistent accounts" of self-defense that are not fatally undermined by any of his other statements to police or trial counsel. He argues that the exculpatory statements, bolstered by his actions after Perez's death, provided the trial justice with sufficient evidence to find *Strickland* prejudice.

We first note that the postconviction-relief statute provides that "[t]he court may receive proof by affidavits, depositions, oral testimony, *or other evidence * * *.*" Section 10-9.1-7 (emphasis added). Thus, while we have remarked that "the most compelling panacea for the questionable reliability of any witness statement is cross-examination," evidence not subject to oath or cross-examination was not categorically barred from the trial justice's consideration. *Ferrell v. Wall*, 889 A.2d 177, 185 (R.I. 2005), *disagreed with on other grounds by Reyes v. State*, 141 A.3d 644, 655 n.15 (R.I. 2016).

We decline to address the state's claim that Rivera's statements were otherwise inadmissible. Evidentiary "issues that were not preserved by a specific objection * * *, sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal." *State v. Gautier*, 950

A.2d 400, 407 (R.I. 2008) (quoting *State v. Pacheco*, 763 A.2d 971, 976 (R.I. 2001)). "That requirement is grounded, in part, in our rules of evidence, which direct 'that a specific ground for an objection must be stated unless the reason for the objection is clear from the context in which it was made.'" *State v. Maxie*, 187 A.3d 330, 343 (R.I. 2018) (quoting *State v. Barros*, 148 A.3d 168, 174 (R.I. 2016)). We give significant deference to a trial justice's ruling on the admissibility of evidence, a "question addressed to the sound discretion of the trial justice" that "will not be disturbed on appeal absent a clear abuse of that discretion." *State v. Briggs*, 886 A.2d 735, 749-50 (R.I. 2005) (quoting *State v. Lynch*, 854 A.2d 1022, 1031 (R.I. 2004)). We have previously noted that the state's memorandum in opposition to Rivera's application is not part of the record before us. "Ultimately, it is the [petitioner's] duty 'to ensure that the record is complete and ready for transmission.'" *Sentas v. Sentas*, 911 A.2d 266, 270 (R.I. 2006) (quoting *Small Business Loan Fund Corp. v. Gallant*, 795 A.2d 531, 532 (R.I. 2002)). We are particularly hard-pressed to determine whether the state's evidentiary objections were presented to the trial justice. Significantly, the trial justice's decision nowhere alludes to any such objections being brought to her attention. Accordingly, they have been waived.

The state also argues that Rivera's exculpatory statements were insufficiently credible to support a finding of *Strickland* prejudice. A trial justice's "charge upon an application for post-conviction relief is to adjudge credibility based upon the

- 31 -

totality of evidence presented." *Ferrell*, 889 A.2d at 188. "When reviewing the grant or denial of postconviction relief, the trial justice's * * * credibility determinations will be upheld 'absent clear error or a determination that the hearing justice misconceived or overlooked material evidence.'" *Hall v. State*, 60 A.3d 928, 931 (R.I. 2013) (quoting *Lynch v. State*, 13 A.3d 603, 605 (R.I. 2011)).

We do not detect clear error, or misconceived or overlooked material evidence, in the trial justice's credibility findings here. The trial justice's decision expounded on the bases of that finding, emphasizing Rivera's "very compelling" allocution, his lack of a criminal record, and the undisputed circumstances that "buttressed" his account of self-defense. We defer to the trial justice's assessment that Rivera's allocution before her at sentencing was "very compelling." A trial justice, "having been present during the entirety of the trial," will have "had ample opportunity to * * * account for 'other realities that cannot be grasped from a reading of a cold record.'" *State v. Rego*, 264 A.3d 840, 846 (R.I. 2021) (quoting *State v. Greenslit*, 135 A.3d 1192, 1198 (R.I. 2016)). The trial justice could also reasonably rely on the record evidence of Rivera's consistent desire to present an account of self-defense at trial, as evinced in trial counsel's deposition testimony and corroborated by his statements in the presentence interview and at sentencing, to infer that he would not have waived his right to testify if adequately advised.

Finally, we agree with the trial justice that the recorded statement appears to be less damaging than trial counsel supposed. The claimed impeachment value of an inference from Rivera's silence appears mired in the basis of the statement's illegality—that the officers ignored Rivera's repeated requests to remain silent. Without, of course, discounting the inconsistencies between his accounts, we note that Rivera's statements to trial counsel, some of which may have been given without an interpreter, evince a narrative of self-defense broadly consistent with the exculpatory statements.

As Rivera highlights, "once [a] defendant introduces some evidence of self-defense, the burden of persuasion is on the prosecution to negate that defense beyond a reasonable doubt." *State v. Rieger*, 763 A.2d 997, 1003 (R.I. 2001) (quoting *State v. Pule*, 435 A.2d 1095, 1098-99 (R.I. 1982)). We are satisfied that the trial justice had ample evidence before her to find a reasonable probability of a different outcome under this standard, thus undermining confidence in her original verdict. *See Bell*, 71 A.3d. at 460.

We hold that the trial justice did not err in granting Rivera's application for postconviction relief.

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court.

The record shall be returned to the Superior Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Miguel Tebalan Rivera v. State of Rhode Island. |
| **Case Number** | No. 2021-76-M.P.<br>(PM 20-8909) |
| **Date Opinion Filed** | June 25, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br>For Defendant:<br><br>Kara J. Maguire<br>Rhode Island Public Defender |